# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

Nos. 08-2382, 08-3673, 08-3675, 09-1121

_____

| | | |
|---|---|---|
| Capella University, Inc., | * | |
| | * | |
| Appellee/ Cross - | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Executive Risk Specialty | * | |
| Insurance Company, | * | Appeals from the United States |
| | * | District Court for the |
| Appellant/ Cross - | * | District of Minnesota. |
| Appellee, | * | |
| | * | [PUBLISHED] |
| Arthur J. Gallagher and Co.; | * | |
| Arthur J. Gallagher Risk | * | |
| Management Services, Inc., | * | |
| | * | |
| Appellees/ Cross - | * | |
| Appellants. | * | |

_____

Submitted: October 22, 2009
Filed: August 20, 2010

_____

Before LOKEN, Chief Judge,[1] HANSEN and MELLOY, Circuit Judges.

_____

[1]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010.  He has been succeeded by the Honorable William Jay Riley.

HANSEN, Circuit Judge.

Executive Risk Specialty Insurance Company (ERSIC) appeals the district court's ruling, resolving cross-motions for summary judgment and declaring that ERSIC owed a duty to defend its insured, Capella University (Capella), against a federal lawsuit brought by one of Capella's former students. ERSIC appeals both the coverage determination and the amount of damages awarded. Capella cross-appeals, arguing the district court should have awarded prejudgment and postjudgment interest. We affirm the district court's holdings regarding coverage and damages, reverse its holding regarding interest, and remand for a judgment to be entered providing for prejudgment and postjudgment interest.

I.

Capella is an internet-based educational institution, to which Jeffrey La Marca matriculated in early 2004. Capella modified its on-line platform in April 2004, and La Marca complained that the change discriminated against students with learning disabilities, like himself. When Capella refused to grant all of La Marca's requested accommodations, La Marca posted comments in on-line course discussion rooms that Capella considered to be inappropriate. The disagreement eventually resulted in Capella suspending La Marca from course work and La Marca filing three complaints against Capella with the United States Department of Education (Department), Office of Civil Rights (OCR).

The OCR is an enforcement agency within the Department and is charged with ensuring that educational institutions receiving federal assistance do not engage in discrimination. See 20 U.S.C. § 3413; 34 C.F.R. § 100.1. The OCR receives and investigates complaints from aggrieved individuals. 34 C.F.R. § 100.7. As will be discussed in detail below, the OCR initially undertakes a limited preliminary investigation. See id. § 100.6.-.7. The OCR is not required by administrative

regulation to notify the recipient[2] (in this case Capella) about a complaint or an associated preliminary investigation. See id. § 100.7. If the preliminary investigation indicates a failure to comply with the administrative regulations governing educational institutions, the OCR "will so inform the recipient and the matter will be resolved by informal means whenever possible." Id. § 100.7(d)(1). If the noncompliance cannot be resolved by informal means, the OCR may effect compliance by refusing or suspending federal financial assistance, by referring the matter to the Department of Justice, or by pursuing any applicable remedy under state or local law. Id. § 100.8. Before the OCR is empowered to effect compliance by any of these more formal means, however, the OCR must notify the recipient of the noncompliance, attempt to secure compliance through voluntary means, and make "an express finding on the record, after opportunity for hearing," of the noncompliance. Id. § 100.8(c). Such hearings are governed by extensive administrative regulation. See id. § 101.1-.131.

Only the second of La Marca's three complaints figures prominently in our analysis. On July 9, 2004, La Marca filed a complaint with the OCR alleging that, *inter alia*, Capella had retaliated against La Marca for filing an earlier OCR complaint. On September 28, 2004, the OCR notified Capella of the allegation and requested that the university provide it with information to evaluate the complaint. Capella provided the requested information, and the OCR eventually concluded there was insufficient evidence that Capella had retaliated against La Marca. La Marca filed administrative appeals of the adverse OCR decisions on his second complaint on two subsequent occasions. Similarly, La Marca administratively appealed the OCR's rejection of his first claim, and La Marca also filed a third claim. All three claims were eventually dismissed administratively when La Marca filed a lawsuit against Capella in July 2005, in federal court in California.

---

[2]A "recipient" under the regulations includes any public or private entity "to whom Federal financial assistance is extended." 34 C.F.R. § 100.13(i).

The federal court civil complaint was based on the same historical facts as the OCR complaints. Capella denied La Marca's allegations and counterclaimed for defamation, trade libel, and intentional interference with prospective economic relations.

Capella believed the July 2005 La Marca lawsuit to be covered by an educators' professional liability policy issued by ERSIC, with a policy period of May 9, 2005, through May 9, 2006. The policy provided:

> The Company shall pay on behalf of an Insured all Loss which such Insured becomes legally obligated to pay on account of any Claim first made against such Insured during or after the Policy Period . . . for:
> (a) Wrongful Act;
> (b) Educator's Errors or Omissions; or
> (c) Employment Practices
> committed, attempted, or allegedly committed or attempted, by such Insured before or during the Policy Period.

(Confidential Appendix of ERSIC (C.A.) at 53.) The policy defines a Claim as:

> (i) a written demand for monetary damages;
> (ii) a civil proceeding commenced by the service of a complaint or similar pleading;
> (iii) a criminal proceeding commenced by the return of an indictment; or
> (iv) a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document,
> against an Insured for a Wrongful Act, including any appeal therefrom.

(C.A. at 60.) The policy also contains the following relevant exclusion:

> The Company shall not be liable for Loss on account of any Claim based upon, arising from, or in consequence of:
> . . . .

(b) any demand for monetary damages, suit, formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document or arbitration proceeding pending, or order, decree or judgment entered against any Insured on or prior to the Pending or Prior date set forth in Item 6 of the Declarations, or the same or any substantially similar fact, circumstance or situation underlying or alleged therein.

(C.A. at 53-54.)  The policy also states that ERSIC "shall have the right and duty to defend any Claim covered by this policy."  (C.A. at 57.)

Capella tendered defense of the La Marca lawsuit to ERSIC.  In September 2005, ERSIC denied that it owed Capella indemnity coverage or a duty to defend against the La Marca lawsuit.  After repeatedly and unsuccessfully requesting coverage, Capella filed this declaratory judgment action against ERSIC.[3]

La Marca's claims against Capella in the underlying lawsuit, for which Capella seeks coverage in this declaratory judgment action, were dismissed after a bench trial in November 2007.  After that trial, Capella made a motion seeking to tax costs and attorney fees to La Marca.  Capella requested that the court order La Marca to pay $800,645.83 in costs and fees.  The federal district court in California denied the motion.

---

[3]Capella also sued Arthur J. Gallagher and Co. and Arthur J. Gallagher Risk Management Services, Inc. (collectively Gallagher). Capella alleged that if the ERSIC policy does not provide coverage for the La Marca lawsuit, then Gallagher, acting as the university's insurance broker, failed to procure proper insurance coverage. The district court held that the claim against Gallagher failed because the ERSIC policy does provide coverage. Capella acknowledges that if this court affirms the district court's holding that the ERSIC policy provides coverage, then we should also affirm the district court's holding regarding Capella's claim against Gallagher. Because we affirm both holdings, we do not further analyze the claim against Gallagher.

Shortly thereafter, the parties in this declaratory judgment action filed cross-motions for summary judgment. The district court heard the motions in January 2008. The court held that ERSIC had breached its contractual duty to defend Capella against the La Marca lawsuit.

After judgment was entered, Capella moved to alter or amend the judgment and moved for attorney fees and costs. Capella sought damages in the amount of the attorney fees and costs it had expended defending the La Marca litigation, as well as fees and costs expended in pursuing this declaratory judgment action. ERSIC challenged various elements of each of Capella's motions. The matter was referred to a magistrate judge for a report and recommendation. The magistrate judge agreed with some of ERSIC's arguments, rejected others, and recommended awarding Capella fees and costs in an amount less than its request. The district court adopted the magistrate judge's recommendation. Neither the magistrate judge nor the district court provided for prejudgment or postjudgment interest.

ERSIC appeals the district court's holding that ERSIC breached its contractual duty to defend. Capella cross appeals, arguing the district court erred in failing to award prejudgment and postjudgment interest.

## II.

ERSIC contends that the district court erred by holding that ERSIC breached its contractual duty to defend Capella against the La Marca lawsuit.[4] First, ERSIC argues that the La Marca lawsuit was not a claim *first made* during the policy period.

---

[4]The parties agree that any question of indemnity is moot because the underlying lawsuit was dismissed and Capella suffered no damages that ERSIC would be liable to indemnify. We agree. In addition, ERSIC does not challenge on appeal the district court's adverse summary judgment of its affirmative defense of misrepresentation.

In support of that argument, ERSIC contends that the disability discrimination claim asserted in the La Marca lawsuit was the subject of La Marca's previous administrative complaints to the OCR. ERSIC argues that the resulting OCR proceedings constituted a claim as defined in the policy and, as such, the claim for which Capella now seeks defense costs was first made prior to the policy period. The policy defines a "Claim" to include "a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document." (C.A. at 60.) ERSIC argues that the OCR proceedings were formal administrative proceedings and consequently constituted a claim, meaning that the subsequent related lawsuit could not be a claim first made during the policy period.

Second, ERSIC argues that, even if the claim was first made during the policy period, the duty to defend the lawsuit is negated by the policy's exclusion because the lawsuit is based upon, arises from, or is in consequence of a formal administrative proceeding that was pending on or prior to the commencement of the policy on May 9, 2005. More specifically, ERSIC argues La Marca's OCR complaint triggered a formal administrative proceeding.

Both of ERSIC's primary arguments depend on an interpretation of the policy concluding that La Marca's complaint to the OCR was a formal administrative proceeding constituting a claim as defined by the policy. As such, if the OCR proceedings were not formal administrative proceedings, then the La Marca lawsuit is a claim first made during the policy period and is not subject to the exclusion as based upon, arising from, or in consequence of a prior or pending formal administrative proceeding. Capella does not dispute that the OCR is an administrative body and that LaMarca's complaint initiated an administrative proceeding. Instead, Capella argues that the OCR proceedings were not formal.[5] We agree.

_____

[5]Capella also argues, and the district court held, that the administrative proceedings were not "commenced by the filing of a notice of charges, formal investigative order or similar document," as required by the policy. Because we hold

The policy does not define the word formal, nor does it specify what constitutes a formal administrative proceeding. Consequently, we must look to state law to assist us in interpreting the insurance contract. Murray v. Greenwich Ins. Co., 533 F.3d 644, 648 (8th Cir. 2008) (applying state substantive law to a dispute involving insurance policy interpretation and diversity of citizenship). Interpretation of an insurance policy is a legal issue, subject to our *de novo* review. Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc., 762 N.W.2d 572, 575 (Minn. 2009). Under Minnesota law, "[b]ecause most insurance policies are preprinted forms drafted solely by insurance companies—basically contracts of adhesion—policy words of inclusion will be broadly construed, and words of exclusion are narrowly considered." Id.

Importantly, the word "formal" must have some meaning. "'Construction of an insurance policy which entirely neutralizes one provision should not be adopted if the contract is susceptible of another construction which gives effect to all of its provisions and is consistent with the general intent.'" Westchester Fire Ins. Co. v. Wallerich, 563 F.3d 707, 712 (8th Cir. 2009) (quoting West Bend Mut. Ins. Co. v. Armstrong, 419 N.W.2d 848, 850 (Minn. Ct. App. 1988)). The same is true for a construction that neutralizes one word. Thus, not every administrative proceeding amounts to a claim under the ERSIC insurance contract.

ERSIC looks to the leading legal dictionary, which defines formal as "[p]ertaining to or following established procedural rules, customs, and practices." Black's Law Dictionary 678 (8th ed. 2004). Certainly, the OCR is subject to established procedural rules and follows routine customs and practices. As discussed below, the OCR is governed by statutes and regulations, and it has established a written "Case Resolution and Investigation Manual" (CRIM). Yet, those rules, practices, and standard operating procedures do not distinguish the OCR and its proceedings from the proceedings of every other administrative entity. We must not

the administrative proceedings in this case were not formal, we need not address the alternative argument and holding.

give the word "formal" an isolated meaning. Instead, the word "must be considered within its context, and with common sense." Id. (quoting Mut. Serv. Cas. Ins. Co. v. Wilson Twp., 603 N.W.2d 151, 153 (Minn. Ct. App. 1999)). To determine that the OCR proceedings in this case amounted to formal administrative proceedings as defined by the policy merely because they follow the CRIM requires turning a blind eye to the administrative context.

ERSIC also relies on a recent case from one of our sister circuits, addressing an insurer's contractual obligation to cover a lawsuit arising from an earlier complaint before the Equal Employment Opportunity Commission. (EEOC). See Am. Ctr. for Int'l Labor Solidarity v. Fed. Ins. Co., 548 F.3d 1103 (D.C. Cir. 2008). American Center interpreted insurance policy language identical to the language at issue in this case and held that the administrative proceedings at issue there were sufficiently formal to amount to a claim under the policy. Id. at 1105. The insured did not notify the insurer of the EEOC complaint and proceedings, so the insured's subsequent notice of the follow-on lawsuit authorized by the right to sue letter issued by the EEOC was untimely under the insurance contract. ERSIC argues the OCR proceedings in this case were similarly formal.

While the court in American Center did not explicitly define "formal administrative proceeding," it is possible to glean certain factors that were important to the court's decision to hold that the administrative proceedings at issue in that case were formal. First, the American Center court held that the EEOC proceedings were formal "[f]or the principle reason that their form is governed by extensive regulation." Id. at 1104-05.[6] Most of the regulations cited in American Center as indicative of the

---

[6]The court listed numerous facets of the EEOC's work that were relevant to the complaint against the insured and were governed by regulation. Integral to the American Center analysis were EEOC regulations governing:

the submission of information on alleged instances of discrimination, 29 C.F.R. § 1601.6; the form, content, and procedure for filing of charges,

formality of the EEOC proceedings lack analogs applicable to the OCR proceedings addressing LaMarca's complaint against Capella. While both the EEOC and the OCR must receive complaints from any aggrieved person, the procedure for filing an EEOC charge is much more regulated. Compare 29 C.F.R. §§ 1601.6-.12 (extensively governing the filing and contents of an EEOC charge), with 34 C.F.R. § 100.7(b) (providing simply for the filing of a written complaint within 180 days of alleged discrimination). Similarly, an EEOC complaint must be served on the alleged discriminator within ten days of its filing, 29 C.F.R. § 1601.14, whereas the OCR apparently need not inform the alleged discriminator of the filing of a complaint or the initiation of the OCR's preliminary investigation until the investigation is completed, see 34 C.F.R. § 100.7 (requiring the OCR to inform the recipient that its investigation indicated a failure to comply or that its investigation warranted no action).[7]

Another factor important to the American Center court was the EEOC's investigative authority at the outset of the proceeding. Any member of the EEOC has standing subpoena authority to require attendance and testimony of witnesses, and access to and production of evidence. 29 C.F.R. § 1601.16. This authority is not tied to any preliminary finding of noncompliance. See id. In contrast, the regulations

> id. §§ 1601.7-.9, .11-.12; the service of charges on alleged discriminators, id. § 1601.14; the Commission's investigative authority, id. § 1601.15, subpoena power, id. § 1601.16, and power to compel witnesses for public hearings, id. § 1601.17; the procedure for Commission determinations of cause, settlement, and dismissal of proceedings, id. §§ 1601.18-.21; the Commission's power to initiate its own civil actions, id. § 1601.27; and Commission's role in empowering individuals to sue, id. § 1601.28.

548 F.3d at 1105.

[7]Apparently, the OCR interprets the statute in this manner, as the OCR did not inform Capella of La Marca's first (April 2004) and third (March 2005) complaints. (C.A. 40.)

governing the preliminary investigation of the OCR do not grant subpoena power. See 34 C.F.R. § 100.7(c). The language governing investigation of an OCR complaint is much less rigid and more permissive, and the more formal investigative powers—upon which American Center relied to hold that the EEOC proceedings in that case were formal—are not available in every OCR proceeding. A preliminary OCR "investigation *should* include, *where appropriate*, a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance . . . occurred, and other factors relevant to a determination as to whether the recipient has failed to comply." 34 C.F.R. § 100.7(c) (emphasis added).

Multiple additional administrative steps are necessary before more formal administrative tools are implicated in an OCR investigation. Even where the preliminary investigation suggests a failure to comply, "the matter will be resolved by informal means whenever possible." Id. § 100.7(d). Once the OCR has determined that the noncompliance cannot be corrected by informal means, "compliance . . . may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by . . . a reference to the Department of Justice." Id. § 100.8(a). Only at this point (a point not ever reached by any of La Marca's three complaints) does an OCR proceeding approach the formality of the EEOC proceedings examined in American Center. Before federal funds may be terminated or suspended, the recipient of federal funds is entitled to notice and a hearing regarding the intended procedure for effecting compliance. Id. §§ 100.8(c), 100.9. Once this hearing is required, the proceedings are governed by a more robust set of procedural rules and guarantees. See id. §§ 101.1-.131. Additionally, the recipient is entitled to further notice (although not a hearing) before the matter may be referred to the Department of Justice. Id. § 100.8(d).

The mandatory use of the regulatory proceedings by a complainant as a prerequisite to bringing a lawsuit is another factor indicating that the proceeding is formal. As noted in American Center, "[t]hat [EEOC] proceedings are regular and formalized . . . is hardly surprising given their statutorily prescribed role as a

necessary predicate to filing a Title VII suit." 548 F.3d at 1105. In contrast, a person desiring to file a lawsuit alleging discrimination by a recipient of federal education monies need not exhaust any remedies with the OCR. While the EEOC is "a kind of national triage center for [employment] discrimination claims" and is concerned with resolving such claims from the perspective of the claimant, id., the OCR's mission is slightly different. The OCR's mission is not limited to resolving individual claims but also includes achieving institutional compliance—i.e., ensuring no discrimination in "any program or activity receiving Federal financial assistance from the Department of Education." 34 C.F.R. § 100.1; see also id. § 100.7(c) (requiring an investigation when—even in the absence of an individual's complaint—a compliance review, report, or any other information indicates noncompliance).

That mission highlights another factor American Center referenced in holding EEOC proceedings to be formal, the "serious consequences for their targets." 548 F.3d at 1105. American Center points out that, in an EEOC proceeding, "records from the investigation, any determination of cause to believe that discrimination occurred, and position statements submitted by the charged party may all be admissible as relevant evidence in subsequent litigation." Id. As discussed above, a preliminary OCR investigation is accompanied by fewer formal investigatory tools. At the same time, regardless of whether an individual complaint has been filed or noncompliance is even suspected, the OCR has the power to require compliance reports and to inspect the documents of any entity receiving funds from the Department of Education. 34 C.F.R. § 100.6. Thus, the preliminary investigation would not be likely to yield records which would be otherwise unavailable to the OCR. Additionally, the OCR is not required by regulation to make any *written* determination of compliance associated with the preliminary investigation. Compare id. § 100.7(d) (requiring a Department official to notify recipient of a failure to comply but not mentioning a writing), with id. § 100.9(d)(2) (requiring written findings to resolve any hearing required by § 100.8(c)). Further, the preliminary OCR investigation does not require, nor must it allow, a written response to every complaint. Compare id. § 100.7 (making no allowance for a response), with id. § 100.9(d)(1) (entitling recipient

"to introduce all relevant evidence" when a hearing is required); id. § 101.52 (allowing recipient to file an answer when a hearing is required); and id. § 101.71 (permitting presiding hearing officer to require written statements of position). Here again, these formalities are not operative until the OCR has completed a preliminary investigation, attempted and failed to secure compliance through informal measures, and decided to effect compliance through one of the formal means listed in 34 C.F.R. § 100.8. Thus, the consequences that American Center was concerned with are lessened in the preliminary OCR proceedings to which Capella was subject.

American Center was also concerned with prejudice to the insurer's ability to resolve the issue precipitating the EEOC complaint before litigation ensues; "if the case remains unresolved at this opening stage, and notice can be withheld until a [civil court] complaint is filed, the insurer's only chance for pre-litigation settlement will have fallen by the wayside." 548 F.3d at 1106. The link between administrative proceedings and civil litigation is much more attenuated in the OCR context. OCR proceedings are neither necessary nor a condition-precedent to filing civil lawsuits. The aggrieved party need not exhaust any remedies with the OCR, and he can file a lawsuit at any point in the OCR process. Indeed, an aggrieved party can avoid the OCR entirely and proceed directly to federal court. Not so, the EEOC complainant.

Based on the foregoing, American Center is factually distinguishable. It remains, however, useful for resolving the primary issue in this case. By applying each of the major indices referenced by American Center, it becomes clear that the OCR proceedings were not formal administrative proceedings under the insurance policy.

First, American Center noted that the proceedings were governed by extensive regulation. 548 F.3d at 1104-05. As discussed above, the OCR proceedings ERSIC points to as formal were subject to much less regulation. Capella was not entitled to notice of the complaints, nor was the university entitled to respond to the substance of the complaints. The OCR was not empowered to subpoena documents or witnesses

-13-

for testimony. The OCR could only demand compliance reports and examine relevant documents at Capella's facilities. If the OCR determined that the matter could not be resolved by informal means and utilizing only informal investigation, then the OCR could initiate formal proceedings—requiring notice, a hearing, and implicating a host of procedural regulations. Only at this point would the OCR proceedings have matched the formality of the proceedings held to be formal in American Center. The fact that the proceedings could eventually become formal does not satisfy the plain language of the policy provisions invoked by ERSIC, which affirmatively requires the occurrence (as opposed to the mere prospect) of formal proceedings. ERSIC relies on the September 2004 OCR letter to Capella, along with the CRIM, in support of its argument that the proceedings were formal. Indeed, the letter and the CRIM detailed an established procedure for evaluating complaints. The letter provided Capella notice of the complaint (but not the name of the complainant), allowed Capella to respond, and requested certain documents from Capella. None of those actions were required by statute or regulation, however.

Second, the OCR proceedings that actually occurred in this case implicated relatively fewer consequences for Capella. The preliminary investigation undertaken lacked the teeth to require production of any document that the OCR could not otherwise have accessed in absence of the proceedings. Nor were written admissions by Capella or a written decision by the OCR required, making it unlikely that such writings would be later used against Capella.

Additionally, because the informal OCR investigation did not reveal a failure to comply with programming regulations, the enforcement and remedy regulations did not even call for *attempts* at informal resolution. Proceedings to suspend or refuse federal financial assistance—which represent the first time OCR proceedings require many formalities—were still further removed. Before such consequences would have been implicated, Capella would have received written notice of noncompliance and the right to a formal hearing.

Finally, the OCR proceedings were not a necessary predicate to the lawsuit against Capella. La Marca could have sued Capella at any time.

ERSIC relies on American Center's statement that "formality is a question of what proceedings might involve rather that a question of what they ultimately end up involving; by the time the extent of the proceedings is known, any notice will come too late to actually provide notice at all." 548 F.3d at 1105. That may be true in the EEOC context, where one notice can initiate an unbroken line of administrative proceedings with serious consequences to both the insured and insurer. The question of "what the proceedings might involve" has a different answer in this case. The extent of the OCR proceedings at issue in this case was limited to a preliminary investigation which could not result in any involuntary adverse consequences until Capella received further notice and the opportunity to be heard. To resolve this case, we need not answer whether, at the point that additional notice is required, the concerns referenced in American Center are implicated and the proceedings become formal. Instead, we conclude only that the administrative proceedings undertaken by the OCR in this case were not yet formal.

ERSIC also relies on the last clause of the exclusion discussed above. ERSIC argues that the exclusion, in addition to precluding coverage for disputes that arise from formal administrative proceedings, also excludes disputes that arise from "a substantially similar situation that was pending or prior to May 9, 2005." (Appellant's Br. at 47.) Again, the exclusion provides:

> The Company shall not be liable for Loss on account of any Claim based upon, arising from, or in consequence of: . . . any demand for monetary damages, suit, formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document or arbitration proceeding pending, or order, decree or judgment entered against any Insured on or prior to the Pending or Prior date . . . or the same or any substantially similar fact, circumstance or situation underlying or alleged therein.

(C.A. at 53-54.) While the exclusion is certainly no model of clarity or skilled draftsmanship, it is sufficiently intelligible when broken down into its component parts. In the introductory clause, the exclusion says that the company will not be liable for damages on account of claims that arise from a list of occurrences. The exclusion then lists those occurrences. The question is whether the final clause—"the same or any substantially similar fact, circumstance or situation underlying or alleged therein"—is an independent member of the list of occurrences or whether it merely modifies each of the other occurrences. It is clear to us that the final clause is a modifier. If, attempting to read the final clause as an independent basis upon which to exclude liability, we excise the remainder of the list and read the final clause together with the introductory clause, we are left with a nonsensical result: "The Company shall not be liable for Loss on account of any Claim based upon, arising from, or in consequence of: . . . the same or any substantially similar fact, circumstance or situation underlying or alleged therein." (C.A. at 53-54). If ERSIC is not liable for loss on account of any claim arising from the facts underlying that claim, then ERSIC is liable for nothing. Adding the "pending or prior" language cannot save ERSIC's preferred interpretation of this claims-made policy. If ERSIC is not liable for loss on account of any claim arising from facts that were pending or prior to the policy period, then the ERSIC policy would be an occurrence-based policy. ERSIC acknowledges that the policy is a claims-made policy.

On the other hand, the exclusion can be coherently read as modifying (and expanding) each of the other items on the list of occurrences. Thus, ERSIC is not liable, for example, "for Loss on account of any Claim based upon . . . [a] formal administrative or regulatory proceeding . . . pending . . . on or prior to [May 9, 2005] . . . or the same or any substantially similar fact, circumstance or situation underlying or alleged therein." See id. In other words, although the loss is not on account of a *claim* based upon a formal administrative proceeding pending or prior to May 9, 2005, the exclusion would still operate if the loss were based upon the same or a substantially similar *fact, circumstance or situation* underlying or alleged in the

-16-

formal administrative proceeding. Because the exclusion is "'subject to two interpretations, one reasonable and the other unreasonable in the context of the policy, the reasonable construction will control.'" Westchester Fire Ins. Co., 563 F.3d at 712 (quoting Mut. Serv. Cas. Ins. Co., 603 N.W.2d at 153). Under the reasonable interpretation of the final clause, the exclusion still requires formal administrative proceedings. There were no formal administrative proceedings, so the "same or substantially similar" language does not exclude Capella's claim.

Because the OCR proceedings were not formal administrative proceedings, the La Marca lawsuit is a claim first made during the policy period, and it is not subject to the exclusion as based upon, arising from, or in consequence of prior or pending formal administrative proceedings. Based on the foregoing, we affirm the district court's holding that ERSIC had a duty to defend Capella against the La Marca lawsuit. The parties' dispute does not end there, however, so neither does our inquiry.

III.

ERSIC challenges elements of the damages awarded by the district court related to the underlying La Marca lawsuit. ERSIC argues Capella should be estopped from requesting more than the $800,645.83 in costs and fees that Capella requested the California district court to order La Marca to pay in the underlying action. Judicial estoppel is an equitable doctrine, invoked by a district court at its discretion, New Hampshire v. Maine, 532 U.S. 742, 750 (2001), and we review the application of judicial estoppel for abuse of discretion, Stallings v. Hussman Corp., 447 F.3d 1041, 1046 (8th Cir. 2006). The judicial estoppel doctrine exists to protect the integrity of the judicial process. Id. at 1047. While the doctrine is not subject to a finite set of elements or factors, three factors have recurred in courts' analyses and have been applied by the United States Supreme Court and this court:

First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

New Hampshire v. Maine, 532 U.S. at 750-51 (internal citations and quotations omitted). Accepting for the sake of argument that Capella's positions in the successive lawsuits are inconsistent, we nonetheless hold that the district court did not abuse its discretion in declining to apply judicial estoppel. The California district court refused to grant Capella's request for fees and costs in the underlying lawsuit. Thus, the court did not accept Capella's estimate of fees and costs, so there is no risk of inconsistent court determinations threatening judicial integrity. Additionally, no unfair advantage to Capella or detriment to ERSIC will result from allowing a subsequent, accurate accounting of the fees and costs to form the basis for the award in this case. Consequently, we affirm the district court's award of fees and costs.

IV.

Capella cross-appeals, arguing that the district court erred in failing to award prejudgment and postjudgment interest. The district court entered a judgment on February 13, 2008, and it amended the judgment on October 15, 2008. The original order did not mention interest, and the amended order refused to "award" Capella prejudgment and postjudgment interest. Capella filed a timely appeal from the October 15, 2008, judgment.

Federal Rule of Appellate Procedure 37(a) provides that, "Unless the law provides otherwise, if a money judgment in a civil case is affirmed, whatever interest is allowed by law is payable from the date when the district court's judgment was entered." At the same time, the United States Code provides that, "Interest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). The combination of Rule 37 and § 1961 has led this court to hold that, "Postjudgment interest is mandatory under 28 U.S.C. § 1961 . . . and should therefore be awarded." Hillside Enters. v. Carlisle Corp., 69 F.3d 1410, 1416 (8th Cir. 1995) (providing for postjudgment interest although it was not requested in the district court) (citing Dunn v. HOVIC, 13 F.3d 58, 60 (3d Cir.), cert. denied, 510 U.S. 1031 (1993)); see also Dunn, 13 F.3d at 62 (holding that "post-judgment interest is awarded by statute as a matter of law so it is automatically added, whether or not the district court orders it"). Capella was entitled to postjudgment interest as provided by § 1961.

"In a diversity case, the question of prejudgment interest is controlled by state law." Trinity Prods., Inc. v. Burgess Steel, L.L.C., 486 F.3d 325, 335 (8th Cir. 2007). "Minnesota adopted a compensatory policy toward prejudgment interest awards by amending Minn. Stat. § 549.09, subd. 1 to provide prejudgment interest in most cases." Solid Gold Realty, Inc. v. Mondry, 399 N.W.2d 681, 683 (Minn. Ct. App. 1987). Similar to 28 U.S.C. § 1961, Minnesota Statute § 549.09 employs the mandatory language "shall." Minn. Stat. § 549.09, subd. 1 ("[I]nterest from the time of the verdict . . . until judgment is finally entered shall be computed by the court administrator . . . ."); id. § 549.09, subd. 2 ("[P]reverdict, preaward, or prereport interest on pecuniary damages shall be computed . . . ."); id. § 645.44, subd. 16 ("'Shall' is mandatory."); Cargill Inc. v. Lone Star Techs., Inc., No. A04-2137, 2005 WL 1514631, *1 (Minn. Ct. App. June 28, 2005) (noting mandatory language "shall" and interpreting Minnesota Statute § 549.09 to provide a "statutory entitlement to . . . preverdict interest").[8] "Indeed, the statute *compels* the computation of

---

[8]Notably, Minnesota Statute § 549.09 distinguishes between prejudgment interest and preverdict interest.

preverdict interest from the date suit was filed except as 'otherwise . . . *allowed* by law,' not as otherwise restricted by law." Marvin Lumber & Cedar Co. v. PPG Indus. Inc., 401 F.3d 901, 919 (8th Cir. 2005) (first emphasis added); see also Seaway Port Auth. of Duluth v. Midland Ins. Co., 430 N.W.2d 242, 252 (Minn. Ct. App. 1988) ("The prejudgment interest statute was not intended to disturb the existing law of prejudgment interest, but to provide for prejudgment interest in situations where prejudgment interest was not already allowed by law. It was settled law before the 1984 amendments to Section 549.09 that where defense costs are awarded against an insurer, prejudgment interest must be paid . . . .").

ERSIC argues that Capella waived any objection to the district court's denial of interest by failing to timely raise the issue in a Federal Rule of Civil Procedure 59(e) motion. ERSIC does not explain why Capella's recourse lies solely with a Rule 59(e) motion, to the exclusion of Capella's timely appeal. Considering this court's previous reluctance to find a wavier of 28 U.S.C. § 1961 postjudgment interest and the similarly mandatory nature of Minnesota Statute § 549.09, we find no reason to treat the prejudgment interest issue differently. Indeed, under Minnesota law, "[i]f a statutory right is to be waived by the parties, the waiver must be voluntary and intentional." Loo v. Loo, 520 N.W.2d 740, 745 (Minn. 1994); see also W. Nat'l Mut. Ins. Co. v. Frost Paint & Oil Corp., No. C3-97-1118, 1998 WL 27247, *4 (Minn. Ct. App. Jan. 27, 1998) (citing Loo and rejecting argument that opposing party waived statutory prejudgment interest). Capella did not waive its right to statutory prejudgment interest.

That portion of the district court's judgment refusing to award statutory prejudgment and postjudgment interest must be reversed. The case will be remanded to allow the district court to include prejudgment interest according to Minnesota Statute § 549.09 and postjudgment interest according to 28 U.S.C. § 1961 in its judgment.

## V.

Accordingly, the judgment of the district court is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this opinion.

_____