# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 09-3764/09-3765/10-1682

_____

| | | |
|---|---|---|
| Equal Employment Opportunity Commission, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | |
| Janet Boot, | * | |
| | * | |
| Intervenor Plaintiff, | * | |
| | * | |
| Remcey Jeunenne Peeples; Monika Starke, | * | |
| | * | |
| Intervenor Plaintiffs - Appellants, | * | |
| | * | Appeals from the United States District Court for the Northern District of Iowa. |
| v. | * | |
| | * | |
| CRST Van Expedited, Inc., | * | |
| | * | |
| Defendant - Appellee. | * | |

------------------------------

| | | |
|---|---|---|
| Equal Employment Advisory Council; Chamber of Commerce of the United States; Society for Human Resource Management; National Federation of Independent Business Small Business Legal Center, | * | |
| | * | |
| Amici on Behalf of Appellee. | * | |

_____

Submitted: May 7, 2012
Filed: May 8, 2012
_____

Before MURPHY, SMITH, and BENTON, Circuit Judges.
_____

SMITH, Circuit Judge.

The Equal Employment Opportunity Commission (EEOC) filed suit in its own name against CRST Van Expedited, Inc. (CRST), alleging that CRST subjected Monika Starke "and approximately 270 similarly situated female employees" to a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. Starke and Remcey Jeunenne Peeples intervened in the EEOC-instituted action and individually pursued their respective hostile work-environment claims against CRST, as well as claims for unlawful retaliation under Title VII and Iowa state law.

The district court ruled in CRST's favor on a series of dispositive motions that collectively disposed of the entire action. The district court also awarded CRST $92,842.21 in costs and $4,467,442.90 in attorneys' fees and expenses, pursuant to 42 U.S.C. § 2000e-5(k) and 28 U.S.C. § 1920, as a sanction for the EEOC's failure to reasonably investigate and conciliate in good faith its claims against CRST.

As set out below, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. *Background*

This consolidated appeal concerns a sweeping employment-discrimination suit that the EEOC instituted against CRST, one of the country's largest interstate trucking

companies. The EEOC alleged that CRST was responsible for severe and pervasive sexual harassment in its New-Driver Training Program ("Training Program"). Because "we are reviewing the district court's grant of summary judgment against [EEOC, Starke, and Peeples], we recite the facts in the light most favorable to [them]." *Bonn v. City of Omaha*, 623 F.3d 587, 589 (8th Cir. 2010).

A. *CRST's Business Model and Training Program*

CRST is an interstate logistics and transit company that employs more than 2,500 long-haul drivers. CRST's business model relies on an efficiency measure known as "Team Driving." CRST operates the trucking industry's largest fleet of team-driven tractor trailers. Specifically, CRST assigns two drivers to a truck who alternate between driving and sleeping on-board in the truck's sleeper cab for as much as 21 days in order to maximize mileage and minimize stops.

Newly hired drivers must successfully complete CRST's Training Program before CRST permits them to drive full time for full pay as certified CRST drivers. The Training Program commences with a three-and-a-half day classroom component ("New-Driver Orientation") to orient the new drivers with CRST's methods and policies.

During new-driver orientation, CRST distributes to each trainee its "Professional Driver's Handbook" ("Driver Handbook"), which contains an entire section devoted to its anti-harassment policy, as well as the procedures for reporting such harassment. Additionally, CRST orientation leaders orally reiterate CRST's written anti-harassment policy, explain to trainees how they can report harassment complaints, and present a video stressing that CRST will not tolerate sexual harassment. The Driver Handbook expressly forbids sexual harassment, as well as any form of retaliation against complainants of sexual harassment. It also instructs employees who endure or witness harassment or discrimination to immediately report the conduct to either an immediate supervisor or the Director of Human Resources.

The Driver Handbook states that "[a]ll reports of harassment and/or discrimination will be handled in a confidential manner." CRST's charges its Human Resources Department (H.R.) with enforcing this anti-harassment policy. At New-Driver Orientation's conclusion, CRST has each trainee sign a written "Acknowledgment and Pledge Concerning Harassment and Discrimination," attesting to the facts that the trainee "received and read [CRST's] Policy Against Unlawful Harassment and Discrimination."

Following orientation, each trainee embarks on a 28-day, over-the-road training trip with an experienced, "Lead Driver," who familiarizes the trainee with CRST's Team Driving model and evaluates the trainee's performance on this maiden haul. At the conclusion of the trainee's 28-day training trip, the trainee's Lead Driver gives the trainee "a pass/fail driving evaluation" that superiors consider when determining whether to certify the trainee as a full-fledged CRST driver. But, under CRST's organizational structure, Lead Drivers lack the authority to hire, fire, promote, demote, or reassign trainees; CRST's Safety and Operations Departments make all final decisions concerning the trainees' employment. Still, in a responsive letter to the EEOC correspondence, H.R. Director James Barnes later described the Lead Driver-trainee relationship as "really no different than the role of supervisors in other industries and organizations."

B. *CRST's Channels for Reporting Sexual Harassment*

CRST accorded its trainees and team drivers multiple channels for reporting sexual harassment. Those channels included (1) CRST's "open-door policy," which encouraged all of its employees to approach their supervisors, any employee in the Operations or Safety Departments, or any manager about any issue; (2) toll-free phone numbers for fleet managers who were available around the clock; (3) Qualcomm, a device placed in every truck that transmits messages, similar to emails, directly to fleet managers; (4) H.R.'s nationwide toll-free number and local toll phone number, both of which CRST provided in the Driver Handbook's section on how to properly report sexual harassment; and (5) evaluation forms given to all trainees at

-4-

the training trip's conclusion soliciting each trainee's feedback concerning his or her lead driver.[1]

## C. *Starke's Initiating Charge*

On December 1, 2005, Starke filed a charge of discrimination with the EEOC. Therein, Starke alleged that CRST "discriminated against [her] on the basis of [her] sex (female) in that [she] was subjected to sexual harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended." In the "Particulars" section of the charge form, Starke stated:

> I was hired by the [CRST] on June 22, 2005[,] in the position of Truck Driver. Since my employment began with the Respondent I have been subjected to sexual harassment on two occasions by my Lead Trainers. On July 7, 2005, Bob Smith, Lead Trainer[,] began to make sexual remarks to me whenever he gave me instructions. He told me that the gear stick is not the penis of my husband, I don't have to touch the gear stick so often. "You got big tits for your size, etc. . . [.]" I informed Bob Smith that I was not interested in a sexual relationship with him. On July 14, 2005, I contacted the dispatcher and was told that I could not get off the truck until the next day. On July 18, 2005[,] through August 3, 2005, David Goodman, Lead Trainer, forced me to have unwanted sex with him on several occasions while we were traveling in order to get a passing grade.

Upon receiving Starke's Charge, the EEOC notified CRST of the filing and instructed CRST to respond, on or before December 30, 2005, with "a written position statement on each of the allegations of the charge, accompanied by documentary evidence and/or written statements, where appropriate." The EEOC

---

[1]In April 2007, CRST added "ReportLine," an independently administered, toll-free hotline that employees may call to report, openly or anonymously, any illegal or improper conduct; ReportLine forwards all personnel-related complaints to H.R. for further review. Because the majority of the alleged harassment predates ReportLine's inception, it is of limited relevance.

advised CRST to "include any additional information and explanation [it] deem[ed] relevant to the [Charge]." The EEOC sent CRST a corresponding, initial "request for information " asking that CRST "submit information and records relevant to the [charge]." The EEOC assured CRST that "[t]he following dates are considered to be the 'relevant period' for the attached [r]equest for [i]nformation: January 2, 2005–November 2, 2005." The EEOC's initial request for information primarily concerned Starke's alleged harassment and did not seek information relating to other potential victims.

On December 21, 2005, CRST submitted its "position statement" to the EEOC and furnished the EEOC with all of the information that the EEOC demanded in the request for information. In its position statement, CRST denied discriminating against or harassing Starke. The company based this denial on its own internal investigation into Starke's claims against Lead Drivers Smith and Goodman.[2] CRST also disclosed the identity of two other female drivers, Lori Essig and Tamara Thiel, who, like Starke, had filed formal charges of discrimination with the EEOC against CRST.

---

[2]Specifically, CRST contended that it interviewed eyewitnesses and the alleged wrongdoers themselves about the matter. With respect to Smith, CRST interviewed Frank Taylor, an eyewitness to some of the alleged harassment, who confirmed that Smith made inappropriate remarks to Starke. Taylor stated that he admonished Starke to abstain from driving with Smith on her training trip if she felt uncomfortable, but that Starke continued driving with Smith anyway. For his part, Smith admitted to uttering inappropriate comments, but he maintained that "nothing physical" transpired between Starke and himself. Regarding Goodman, H.R. discovered that, on August 3, 2005, Starke reported on her evaluation form that Goodman had treated her "very well." When CRST confronted Goodman about Starke's allegations, Goodman acknowledged having a sexual relationship with Starke but averred that it was consensual. Goodman's co-driver, Timothy Walker, corroborated Goodman's account that the relationship was consensual, asserting that he overheard four "love messages" that Starke had left on Goodman's voicemail.

D. *The EEOC's Investigation and Reasonable Cause Determination*

In the months that followed, the EEOC sent multiple supplemental requests for information to CRST. Over the course of the investigation, the EEOC learned that, in addition to Starke, Essig, and Thiel, female drivers Rhonda Morgan and Peeples had also filed discrimination charges against CRST for alleged sexual harassment. On July 28, 2006, the EEOC submitted a third supplemental Request for Information to CRST. This third request for information asked that CRST furnish "a copy of all other [c]harges of [d]iscrimination that CRST has received in the past five years from any government agency that alleges sexual harassment." Additionally, the EEOC demanded "the name, gender, home address, and home telephone number of all employees that were trained by either [Smith] and/or [Goodman]," including "the dates of the training and documentation of any complaints made against these two trainers by any of these trainees."

On March 22, 2007, the EEOC presented CRST with a fourth supplemental request for information seeking detailed contact information for all of its dispatchers who worked during a complaint-relevant time and for female drivers that began working after January 1, 2005.

On July 12, 2007, the EEOC presented CRST with its "Letter of Determination," which (1) notified CRST that the EEOC had found reasonable cause to believe that CRST subjected Starke and "a class of employees" to sexual harassment on the basis of gender and (2) offered to conciliate the claim.

E. *The EEOC's and CRST's Conciliation*

On August 6 and August 7, 2007, CRST counsel Thomas D. Wolle contacted EEOC Investigator Pamela Bloomer to confirm CRST's desire to conciliate with the EEOC. On August 8, 2007, Bloomer left Wolle a voicemail message asking Wolle to send CRST's conciliation proposal by August 16, 2007. Wolle responded that he preferred that the EEOC initiate the proposal process.

On August 17, 2007, Wolle and Bloomer held a telephone conversation during which Bloomer told Wolle that the EEOC would require CRST to send a letter to past and present employees to help identify class members who might be part of a settlement. On August 24, 2007, Wolle telephoned Bloomer to inform her that he had spoken with Starke's counsel and that, from that conversation, CRST had determined that conciliation appeared futile. Wolle promised to send an email confirming CRST's position regarding the futility of conciliation. Bloomer responded that "the next step after conciliation would be [the] EEOC's internal decision whether to litigate on behalf of [Starke] and the class or provide [Starke] with a [right-to-sue] letter."

The parties could reach no agreement on conciliation and, on August 28, 2007, the EEOC notified CRST that the EEOC had "determined that its efforts to conciliate [the Charge] as required by [Title VII] have been unsuccessful." The EEOC added that because "further conciliation efforts would be futile or non-productive," it would "not make further efforts to conciliate [the Charge]" and was "forwarding the case to [its] legal unit for possible litigation."

F. *The Instant Lawsuit*

On September 27, 2007, the EEOC filed the instant lawsuit seeking redress for the discrimination that Starke "and a class of similarly situated female employees of [CRST]" allegedly endured. The EEOC brought the suit in its own name, pursuant to § 706 of Title VII, 42 U.S.C. § 2000e-5, "to correct [CRST's] unlawful employment practices on the basis of sex, and to provide appropriate relief to [Starke] and a class of similarly situated female employees of [CRST] who were adversely affected by such practices." The amended complaint alleged, in pertinent part, as follows:

7.   . . . two of [CRST's] [L]ead [D]rivers subjected Starke to sexual harassment during their supervision of Starke (including, but not limited to, unwelcome sexual conduct, other unwelcome physical touching, propositions of sex, and sexual comments), which further created a sexually hostile and offensive work environment. CRST is liable for the harm caused by the harassment and the hostile and offensive work

-8-

environment because of the actions of its [L]ead [D]rivers and because of its failure and refusal to take prompt and appropriate action to prevent, correct, and protect Starke from the harassment and the hostile work environment, culminating in her discharge from employment with CRST.

8.  Other similarly situated female employees of CRST were also subjected to sexual harassment and a sexually hostile and offensive work environment while working for CRST . . . .

9.  The effect of the practices complained of in Paragraphs 7 and 8 has been to deprive Starke and a class of similarly situated female employees of equal employment opportunities, and to otherwise adversely affect their status as employees, because of sex.

The EEOC alleged that CRST perpetrated these actions intentionally and "with malice or with reckless indifference to the federally protected rights of Starke and the class of similarly situated female employees."

In its prayer for relief, the EEOC sought (1) "a permanent injunction enjoining CRST and its officers, successors, and assigns, and all persons in active concert or participation with them, from engaging in sexual harassment, [and] any other employment practice which discriminates on the basis of sex"; (2) an order compelling "CRST to institute and carry out policies, practices, and programs which provide equal employment opportunities for women, and which eradicate the effects of its past and present unlawful employment practices"; (3) a "make[-]whole" order awarding Starke and the class backpay and benefits with prejudgment interest; (4) an order awarding Starke and the class compensatory damages and punitive damages; and (5) an order awarding the EEOC the costs of this action.

From September 27, 2007, the date that the EEOC filed suit, until nearly two years thereafter, the EEOC did not identify the women comprising the putative class despite the district court's and CRST's repeated requests to do so. According to the

district court, "it was unclear whether the instant Section 706 lawsuit involved two, twenty or two thousand 'allegedly aggrieved persons.'" *EEOC v. CRST Van Expedited, Inc.*, No. 07-CV-95-LRR, 2009 WL 2524402, at *8 (N.D. Iowa Aug. 13, 2009) (quoting 42 U.S.C. § 2000e-5(f)(1)). The district court concluded that "the EEOC did not know how many allegedly aggrieved persons on whose behalf it was seeking relief," but "[i]nstead . . . was using discovery to find them."[3] *Id.* at *9.

---

[3]The district court supported this conclusion with the following chronology of discovery in the case:

> On May 29, 2008, for example, the EEOC sent 2,000 letters to former CRST female employees to solicit their participation in this lawsuit. On September 28, 2008, the EEOC sent another 730 solicitation letters to former CRST female employees. There was a clear and present danger that this case would drag on for years as the EEOC conducted wide-ranging discovery and continued to identify allegedly aggrieved persons. The EEOC's litigation strategy was untenable: CRST faced a continuously moving target of allegedly aggrieved persons, the risk of never-ending discovery and indefinite continuance of trial.

> On August 8, 2008, CRST asked the court to establish a date "by which the EEOC completes its identification of class members." Response (docket no. 38), at 4. The EEOC responded that it had identified "a total of 49 class members so far," predicted the "total class will reach between 100 and 150 individuals," indicated it believed it could identify "the bulk of the class members" by October 15, 2008, and suggested a December 7, 2008 deadline for identifying the "class members." Reply (docket no. 42), at 1–3.

> On August 20, 2008, the court set a[n] October 15, 2008 deadline for the EEOC "to disclose the identit[ies] of class members." The court also continued the parties' previously agreed-upon discovery deadline to January 15, 2009.

> By October 15, 2008, the EEOC identified approximately 270 allegedly aggrieved persons to CRST. The number of "class members" greatly increased in the ten days immediately preceding the deadline.

-10-

Prior to October 7, 2008, the EEOC had identified only seventy-nine "class members" to CRST. On October 7, 2008, the EEOC identified 40 new "class members" and advised CRST that the "[i]nvestigation is continuing." Seventh Supplement to Initial Disclosures (docket no. 243-5), at 1. On October 15, 2008, the EEOC identified 119 more "class members" and again advised CRST that the "[i]nvestigation is continuing." Eighth Supplement to Initial Disclosures (docket no. 243-6), at 1; Ninth Supplement to Initial Disclosures (docket no. 243-7), at 1; Tenth Supplement to Initial Disclosures (docket no. 243-8), at 1. Also on October 15, 2008, the EEOC partially identified 66 additional persons and stated [that] "the EEOC expects [that] all [of] these individuals are class members . . . ." Eleventh Supplement to Initial Disclosures (docket no. 243-9), at 1. Again, the EEOC stated that the "[i]nvestigation is continuing." *Id.* at 1.

The total number of allegedly aggrieved persons identified or partially identified by the EEOC by October 15, 2008[,] was much greater than CRST had anticipated based upon the EEOC's prior representations to the court. *See, e.g.*, Response (docket no. 42), at 1–2 (EEOC estimates "the total class will reach between 100 and 150 individuals"); Scheduling Order at 2 (EEOC estimates a twenty-day trial). Therefore, on November 6, 2008, CRST filed a "Motion under Rule 16(f) for an Order to Show Cause Concerning the EEOC's Identification of Class Members." Motion to Show Cause (docket no. 56). CRST alleged that the EEOC did not have a good-faith basis for naming so many allegedly aggrieved persons; CRST accused the EEOC of adopting a policy of "naming everyone and asking questions later" just before the October 15, 2008 deadline. Brief in Support of Motion to Show Cause (docket no. 56-2), at 10. CRST alleged that the EEOC had simply added a large number of names found in CRST's human resources files without ever speaking to those individuals. Further, the EEOC had indicated to CRST that it reserved unto itself the option in the future "to remove some women from this list at a later date." *Id.* at 11.

. . . The court took the EEOC at its word that it had a good-faith belief that each and every one of the approximately 270 women it had

The district court issued two orders to the EEOC, compelling the agency to (1) immediately amend its list of 270 women as soon as it learned of any women whose claims it no longer wished to pursue and (2) make all women on whose behalf it sought relief available to CRST for deposition. *Id.* at *10. The district court warned the EEOC that its failure to present any woman for deposition before discovery's conclusion on January 15, 2009, would result in a "discovery sanction" forbidding that woman from testifying at trial and barring the EEOC from seeking relief on her behalf in the case. *Id.* As authority for this order, the district court "invoked its inherent case[-]management authority" under, *inter alia*, Federal Rules of Civil Procedure 26(f) and 16(b). *Id.* Thereafter, the EEOC made 150 of the 270 women available for deposition, prompting the district court to honor its prior order by precluding the EEOC from pursuing relief for the remaining 120 women. *Id.* at *11.

The district court, in a series of five orders, dismissed the EEOC's claims relating to over half of these 150 women. We recite only the dismissals that the EEOC currently appeals. In all, the EEOC appeals the district court's dismissal of its claims as to 107 women. First, on May 13, 2009, the district court granted CRST summary judgment against three women,[4] including Starke, reasoning that the women were judicially estopped from prosecuting their claims. *EEOC v. CRST Van Expedited, Inc.*, 614 F. Supp. 2d 968 (N.D. Iowa 2009). The court applied judicial estoppel because each woman failed to disclose on her bankruptcy petition her involvement

---

disclosed to CRST before the deadline had an actionable claim for sex discrimination. . . . The court expressed concern, however, that "CRST [still] might unfairly face a 'moving target' of prospective plaintiffs as discovery winds down and trial approaches." Order (docket no. 66), at 8.

*Id.* at *9–10 (footnote omitted and alterations added, in part).

[4]Starke, Christina Payne, and Robin Timmons.

-12-

or potential involvement in the instant lawsuit. *Id.* at 973–76. As part of this first order, the district court also judicially estopped the EEOC from seeking redress for the three women's alleged harassment. *Id.* at 976–77. Second, on June 2, 2009, the district court granted CRST summary judgment, on the merits, as to Peeples because she (1) failed to report her alleged harassment to CRST in a timely manner and (2) failed to create a genuine issue of material fact as to all of the essential elements of her retaliatory-discharge claim. *EEOC v. CRST Van Expedited, Inc.,* No. 07-CV-95-LRR, 2009 WL 1586193 (N.D. Iowa June 2, 2009). Third, on June 18, 2009, the district court granted CRST global summary judgment as to the EEOC's claims on behalf of 11 women[5] and partial summary judgment as to the EEOC's claims on behalf of 8 others;[6] the district court premised these rulings on either the individual claimants' failure to timely report alleged sexual harassment or CRST's prompt and effective response to the reports that it actually received. *EEOC v. CRST Van Expedited, Inc.*, No. 07-CV-95-LRR, 2009 WL 1783495 (N.D. Iowa June 18, 2009). Fourth, on July 6, 2009, the district court granted CRST summary judgment as to the EEOC's claims on behalf of three women[7] because the alleged harassment was not sufficiently severe or pervasive. Fifth, on July 9, 2009, the district court granted CRST summary judgment as to the EEOC's claims on behalf of, *inter alia*, 25 women[8]

---

[5]Bonnie Batyik, Bethany Broeker, Kim Chisholm, Samantha Cunningham, Denise Desonier, Maybi Fernandez-Fabre, Ginger Laudermilk, Verona McIver, Faith Shadden, Rachel Tucker, and Diana Vance.

[6]Pamela Barlow, Peggy Blake, Donna Dickson, Nicole Edwards, Zelestine Grant, Martha Griffin, Carole Pettit, and Rhonda Wellman.

[7]Victoria Holmes, January Jackson, and Tillie Jones.

[8]Antoinette Baldwin, Mary Beaton, Catherine Coronado, Dorothy Dockery, Catherine (Granofsky)-Fletcher, Debra Hindes, Tracy Hughes, January Jackson, Patricia Marzett, Virginia Mason, Lucinda McBlair, Bonnie Moesch, Sherry O'Donnell, Christina Payne, Tammi Pile, Sharon Pinchem, Peggy Pratt, Danette Quintanilla, Kathleen Seymour, Jonne Shepler, Linda Skaggs, Mary "Emily" Smith, Jennifer Susson, Robin Timmons, and Betsy Ybarra.

for their failure to timely report alleged harassment and/or the lack of severity or pervasiveness of the alleged harassment. *EEOC v. CRST Van Expedited, Inc.*, No. 07-CV-95-LRR, 2009 WL 2068386 (N.D. Iowa July 9, 2009).

Finally, on August 13, 2009, the district court barred the EEOC from seeking relief for the remaining 67 women after concluding that the EEOC had failed to conduct a reasonable investigation and *bona fide* conciliation of these claims—statutory conditions precedent to instituting suit. *EEOC v. CRST Van Expedited, Inc.*, No. 07-CV-95-LRR, 2009 WL 2524402 (N.D. Iowa Aug. 13, 2009). Having disposed of all the allegedly aggrieved women in the EEOC's putative "class," the district court dismissed the EEOC's complaint.

We now consider three consolidated appeals: (1) Starke's and Peeples's joint appeal,[9] in which Starke appeals the summary judgment of her case on judicial estoppel grounds and additionally joins Peeples in appealing summary judgment on the merits; (2) the EEOC's first numbered appeal,[10] consolidated with Starke's and Peeples's, in which the EEOC appeals the district court's multiple dispositive rulings that we recounted above; and (3) the EEOC's second numbered appeal,[11] in which it challenges the district court's award of attorneys' fees.

## II. *Discussion*
### A. *EEOC's Investigation and Conciliation*

In its first point on appeal, the EEOC urges that we reverse the district court's decision to bar the EEOC from pursuing claims as to 67 women based on its failure to reasonably investigate or good-faith conciliate. We hold that the district court did

---

[9]Appeal No. 09-3764

[10]Appeal No. 09-3765

[11]Appeal No. 10-1682

-14-

not err in dismissing the EEOC's claims as to 67 women for its failure to investigate and conciliate them.

### 1. *Overview of Title VII's Pre-suit Requirements*

Section 706 of Title VII, the provision under which the EEOC sued, authorizes the EEOC to bring suit in its own name, on behalf of a "person or persons aggrieved" by the employer's unlawful employment practice. 42 U.S.C. § 2000e-5(f)(1); *accord Gen. Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 324 (1980) ("Given the clear purpose of Title VII, the EEOC's jurisdiction over enforcement, and the remedies available, the EEOC need look no further than § 706 for its authority to bring suit in its own name for the purpose, among others, of securing relief for a group of aggrieved individuals."). However, "[a]s originally enacted[,] Title VII did not empower the [EEOC] to sue employers to enforce the Act." *EEOC v. Hickey-Mitchell Co.*, 507 F.2d 944, 947 (8th Cir. 1974) (citing Act of July 2, 1964, Pub. L. 88-352, tit. VII, 78 Stat. 253).

> Rather, "[c]ooperation and voluntary compliance were selected as the preferred means for achieving" equality of employment opportunities. Voluntary compliance proved elusive, however, as more than half of the EEOC's conciliation efforts were deemed unsuccessful. Consequently, Congress enacted the Equal Employment Opportunity Act of 1972 which amended Title VII to permit the EEOC suits. The statutory mandate that the EEOC attempt conciliation was not abandoned, however, and the Act expressly conditions the EEOC's power of suit on its inability to "secure from the respondent a conciliation agreement acceptable to the EEOC."

*Id.* (internal footnotes omitted); *accord Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 368 (1977).

Thus, "[i]n the Equal Employment Opportunity Act of 1972, Congress established an integrated, multistep enforcement procedure culminating in the

EEOC's authority to bring a civil action in a federal court." *Occidental Life Ins. Co.*, 432 U.S. at 359 (internal footnote omitted). First, an employee files with the EEOC a charge "alleging that an employer has engaged in an unlawful employment practice." *Id.* Second, "[t]he EEOC is then required to investigate the charge and determine whether there is reasonable cause to believe that it is true." *Id.* If reasonable cause does exist, the EEOC moves to the third step, which attempts to remedy the objectionable employment practice through the informal, nonjudicial means "'of conference, conciliation, and persuasion.'" *Id.* (quoting 42 U.S.C. § 2000e-5(b)). However, if unsuccessful, the EEOC may move to the fourth and final step and bring a civil action to redress the charge. *Id.* at 359–60 (quoting 42 U.S.C. § 2000e-5(f)(1)).

As we have recognized, the EEOC's "'power of suit and administrative process [are not] unrelated activities, [but] *sequential steps in a unified scheme* for securing compliance with Title VII.'" *Hickey-Mitchell Co.*, 507 F.2d at 948 (alterations in original) (emphasis added) (quoting *EEOC v. E.I. DuPont de Nemours & Co.*, 373 F. Supp. 1321, 1333 (D. Del. 1974)); *accord EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1185 (4th Cir. 1981).

### 2. *Adequacy of the EEOC's Investigation and Conciliation*

The district court barred the EEOC from pursuing claims as to 67 women based on its conclusion that "the EEOC did not investigate, issue a reasonable cause determination or conciliate the claims." *CRST Van Expedited, Inc.*, 2009 WL 2524402, at *19. On appeal, the EEOC avers that the district court wrongly concluded that the EEOC's investigation, resulting reasonable-cause determination, and conciliation were insufficient to satisfy § 706. It argues that the district court (1) misconstrued the EEOC's efforts through serial requests for information to investigate discrimination suffered by persons other than Starke; and (2) incorrectly assumed that the "EEOC had to investigate, issue a cause finding [regarding], and conciliate each individual instance of CRST's failure to respond appropriately to a harassment

-16-

complaint." The EEOC contends that it "needed only to investigate, issue a cause finding as to, and conciliate each *type* of discrimination alleged."

In its analysis, the district court acknowledged that "the EEOC was entitled to expand its investigation of Starke's Charge and consider whether CRST had tolerated the sexual harassment of other female drivers." *Id*. at \*15. It noted that, during the course of its investigation, the EEOC did discover "the allegations of a number of other female drivers, including Essig, Morgan, Peeples and Thiel." *Id*. (concluding that these female drivers' allegations of sexual harassment grew out of the EEOC's investigation of Starke's Charge). The court also recognized that it could "not second-guess the EEOC's finding in the Letter of Determination that," *inter alia*, reasonable cause existed "'to believe that [CRST] ha[d] subjected a class of employees and prospective employees to sexual harassment, in violation of Title VII.'" *Id*.

Nevertheless, the court determined that, based on the factual record in this case, "the EEOC did not conduct *any* investigation of the specific allegations of the allegedly aggrieved persons for whom it seeks relief at trial before filing the Complaint—let alone issue a reasonable cause determination as to those allegations or conciliate them." *Id*. at \*16. The district court concluded that the EEOC "wholly abandoned its statutory duties as to the remaining 67 allegedly aggrieved persons for whom the EEOC . . . intend[ed] to seek relief at trial." *Id.* The court based its conclusion upon the following, undisputed facts:

- The EEOC did not investigate the specific allegations of any of the 67 allegedly aggrieved persons until after the Complaint was filed. For example, the EEOC did not interview any witnesses or subpoena any documents to determine whether any of their allegations were true.

- The EEOC did not identify any of the 67 allegedly aggrieved persons as members of the Letter of Determination's "class" until after it filed the Complaint. Indeed, prior to filing the Complaint,

-17-

CRST enquired as to the size of the "class[,]" and the EEOC responded that it did not know.

- The EEOC did not make a reasonable[-]cause determination as to the specific allegations of any of the 67 allegedly aggrieved persons prior to filing the Complaint. Indeed, at the time the EEOC issued the Letter of Determination on July 12, 2007, 27 of the remaining 67 allegedly aggrieved persons *had not yet been sexually harassed*. Indeed, most of these 27 women allege they were sexually harassed *after the instant lawsuit was filed*. Although 38 of the remaining 40 allegedly aggrieved persons allege [that] they were sexually harassed before the EEOC issued the Letter of Determination on July 12, 2007, the EEOC admits that it was not even aware of their allegations until after the filing of the Complaint. The EEOC used discovery in the instant lawsuit to find them.

- The EEOC did not attempt to conciliate the specific allegations of the 67 allegedly aggrieved persons prior to filing the Complaint.

*Id*. (internal footnote omitted).

The EEOC's suit alleging multiple acts of discrimination by CRST arose out of Starke's single initiating charge. Relevant precedents permit such an expansion by the EEOC, so long as the EEOC satisfies all of its pre-suit obligations for each additional claim. The Supreme Court has observed that when the EEOC brings suits under § 706 on behalf of a group of aggrieved persons, the EEOC is "master of its own case." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 291 (2002). And, as a general rule, "the nature and extent of an EEOC investigation into a discrimination claim is a matter within the discretion of that agency." *EEOC v. KECO Indus., Inc.*, 748 F.2d 1097, 1100 (6th Cir. 1984).

Although "the EEOC enjoys wide latitude in investigating and filing lawsuits related to charges of discrimination, Title VII limits that latitude to some degree by

'plac[ing] a strong emphasis on administrative, rather than judicial, resolution of disputes.'" *U.S. Equal Opportunity Comm'n v. Dillard's Inc.*, No. 08–CV–1780–IEG (PCL), 2011 WL 2784516, at *5 (S.D. Cal. July 14, 2011) (slip op.) (quoting *EEOC v. Jillian's of Indianapolis, Ind., Inc.*, 279 F. Supp. 2d 974, 979 (S.D. Ind. 2003)). For our part, we have recognized that

> [t]he permissible scope of an EEOC lawsuit is not confined to the specific allegations in the charge; rather, it may extend to any discrimination like or related to the substance of the allegations in the charge and which reasonably can be expected to grow out of the investigation triggered by the charge. The original charge is sufficient to support EEOC action, including a civil suit, for any discrimination stated in the charge or *developed during a reasonable investigation of the charge*, *so long as the additional allegations of discrimination are included in the reasonable cause determination and subject to a conciliation proceeding*.

*EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 668 (8th Cir. 1992) (emphasis added). Thus, while "[t]he EEOC may seek relief on behalf of individuals beyond the charging parties and for alleged wrongdoing beyond those originally charged," it "must discover such individuals and wrongdoing *during the course of its investigation*." *Dillard's Inc.*, 2011 WL 2784516, at *6 (citing *Jillian's*, 279 F. Supp. 2d at 980; *EEOC v. Harvey L. Walner & Assoc.*, 91 F.3d 963, 968 (7th Cir. 1996) ("[The] EEOC may allege in a complaint whatever unlawful conduct it has uncovered during the course of its investigation, provided that there is a reasonable nexus between the initial charge and the subsequent allegations in the complaint."); *EEOC v. United Parcel Serv.*, 94 F.3d 314, 318 (7th Cir.1996) ("[The EEOC] may, to the extent warranted by an investigation reasonably related in scope to the allegations of the underlying charge, seek relief on behalf of individuals beyond the charging parties who are identified during the investigation."); *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 380 (6th Cir. 2002) ("[W]here facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." (internal quotation marks

omitted)); *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994) ("[T]he jurisdictional scope of [an individual] Title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation.") (internal quotation marks omitted)). "The relatedness of the initial charge, the EEOC's investigation and conciliation efforts, and the allegations in the complaint is necessary to provide the defendant-employer adequate notice of the charges against it and a genuine opportunity to resolve all charges through conciliation." *Id.* (citing *EEOC v. Outback Steak House of Fla., Inc.*, 520 F. Supp. 2d 1250, 1263 (D. Colo. 2007) (citing *EEOC v. Am. Nat'l Bank*, 652 F.2d 1178, 1185 (4th Cir. 1981))).

In summary, while we recognize that "[t]he EEOC enjoys significant latitude to investigate claims of discrimination, and to allege claims in federal court based on the results of its investigations," we find "a clear and important distinction between 'facts gathered during the scope of an investigation and facts gathered during the discovery phase of an already-filed lawsuit.'" *Id.* at *7 (quoting *Jillian's*, 279 F. Supp. 2d at 982).[12] "Where the scope of its pre-litigation efforts are limited—in terms of

---

[12]In *Jillian's*, the district court explained that

[i]t was only after conducting discovery with respect to its original complaint that the EEOC decided to expand its lawsuit to include a nationwide class. The Seventh Circuit approached this issue in *Walner*, where it impliedly distinguished between facts gathered during the scope of an investigation and facts gathered during the discovery phase of an already-filed lawsuit. "We wholeheartedly agree with EEOC's point that it may obtain relief for instances of discrimination that it discovers during an investigation of a timely charge . . . . However, these investigations may not be accomplished through a process of discovery that follows a complaint based upon an insufficient charge of discrimination." *Id.* at 971–972 (emphasis added). We conclude that the same standard must be applied to the relationship between the lawsuit and its underlying investigation as is applied to the relationship between the lawsuit and its underlying charge.

geography, number of claimants, or nature of claims—the EEOC 'may not use discovery in the resulting lawsuit 'as a fishing expedition' to uncover more violations.'" *Id*. (quoting *EEOC v. Target Corp.*, No. 02–C–146, 2007 WL 1461298 (E.D. Wis. May 16, 2007) (citing *Walner*, 91 F.3d at 971)).

Here, after Bloomer discovered during the course of her investigation that Essig, Morgan, Peeples, and Thiel "had filed formal charges of discrimination against CRST for alleged sexual harassment," the EEOC requested that "CRST provide 'a copy of all other [c]harges of [d]iscrimination that [CRST] has received in the past five years from any government agency that alleges sexual harassment.'" *CRST Van Expedited, Inc.*, 2009 WL 2524402, at *3. It additionally requested that CRST provide "'the name, gender, home address, and home telephone number of all employees that were trained by either [Smith] and/or [Goodman],' including 'the dates of the training and documentation of any complaints made against these two trainers by any of these trainees.'" *Id*. The EEOC later requested information for "female driver[s] that began [their] employment on or after January 1, 2005." *Id*. at *4. Although CRST felt that the EEOC's request for such information was "overly broad," it ultimately "mailed the remainder of the information to the EEOC on a computer disc." *Id*. at *5. Thereafter, the EEOC issued a Letter of Determination to CRST, stating, *inter alia*, that "'there is reasonable cause to believe that [CRST] has subjected a class of employees and prospective employees to sexual harassment, in violation of Title VII.'" *Id*. at *6.

"The Letter of Determination did not provide CRST with any notice as to the size of the 'class of employees and prospective employees [subjected] to sexual harassment.'" *Id*. at *8. And, during conciliation, the EEOC was unable "to provide [CRST] names of all class members . . . , or an indication of the size of the class." *Id*. at *7. Likewise, "the EEOC's Complaint provides no indication of how many

*Id*. at 981–82.

-21-

'similarly situated female employees' the EEOC alleged to exist." *Id*. at *8. It was not until *after* the commencement of the instant suit that the EEOC sought to ascertain the size of the class. *See id*. at *9 ("On May 29, 2008, for example, the EEOC sent 2,000 letters to former CRST female employees to solicit their participation in this lawsuit. On September 28, 2008, the EEOC sent another 730 solicitation letters to former CRST female employees. There was a clear and present danger that this case would drag on for years as the EEOC conducted wide-ranging discovery and continued to identify allegedly aggrieved persons. The EEOC's litigation strategy was untenable: CRST faced a continuously moving target of allegedly aggrieved persons, the risk of never-ending discovery and indefinite continuance of trial."). The number of purported class members continuously changed throughout the discovery process. *See id*. at *9–10. Ultimately, the EEOC identified 67 members of the "class." *Id*. at *10.

The EEOC's aforementioned conduct demonstrates that it did not reasonably investigate the class allegations of sexual harassment "during a reasonable investigation of the charge." *Delight Wholesale Co.*, 973 F.2d at 668. Instead, it engaged in fact-gathering as to the "class" "during the discovery phase of an already-filed lawsuit." *Dillard's Inc.*, 2011 WL 2784516, at *7 (quotation and citation omitted). Our review of the undisputed facts demonstrates that the EEOC was "us[ing] discovery in the resulting lawsuit as a fishing expedition to uncover more violations." *Id*. (quotation and citation omitted). "[T]he EEOC did not investigate the specific allegations of *any* of the 67 allegedly aggrieved persons [, i.e., the class members,] until *after* the Complaint was filed." *CRST Van Expedited, Inc.*, 2009 WL 2524402, at *16 (emphasis added). Tellingly,

> at the time the EEOC issued the Letter of Determination on July 12, 2007, 27 of the remaining 67 allegedly aggrieved persons had not yet been sexually harassed. Indeed, most of these 27 women allege they were sexually harassed after the instant lawsuit was filed. Although 38 of the remaining 40 allegedly aggrieved persons allege they were

-22-

sexually harassed before the EEOC issued the Letter of Determination on July 12, 2007, the EEOC admits that it was not even aware of their allegations until after the filing of the Complaint.

*Id*.

Absent an investigation and reasonable cause determination apprising the employer of the charges lodged against it, the employer has no meaningful opportunity to conciliate. *See EEOC v. Gen. Elec. Co.*, 532 F.2d 359, 366 n.14 (4th Cir. 1976) ("Since the determination of reasonable cause defines the framework for conciliation, it follows that the issues to be litigated here must be those which can fairly be said to be encompassed within the determination resulting from the [initiating] charge.") (quotations and citation omitted).[13]

Moreover, contrary to the EEOC's contention, the district court did not abuse its discretion in opting to dismiss, rather than stay, the EEOC's complaint as to these 67 women. Under § 706(f)(1) of Title VII, "[u]pon request, the court *may, in its discretion*, stay further proceedings for not more than sixty days pending . . . further efforts of the EEOC to obtain voluntary compliance." 42 U.S.C. § 2000e-5(f)(1)

---

[13]"Notably, the EEOC did *not* allege that CRST was engaged in 'a pattern or practice' of illegal sex-based discrimination or otherwise plead a violation of Section 707 of Title VII, 42 U.S.C. § 2000e-6." *CRST Van Expedited, Inc.*, 2009 WL 2524402, at *7 n.14. The district court had "assumed [that] the EEOC had the right to maintain a pattern-or-practice claim in this case but dismissed it with prejudice. The court held as a matter of law that there was insufficient evidence from which a reasonable jury could find that it was CRST's 'standard operating procedure' to tolerate sexual harassment." *Id*. We, like the district court, "express[] no view as to whether the EEOC's investigation, determination and conciliation of Starke's Charge would be sufficient to support a *pattern[-]or-practice* lawsuit." *Id*. at *16 n.21 (citing *EEOC v. Dial Corp.*, 156 F. Supp. 2d 926, 934–44 (N.D. Ill. 2001) (permitting the EEOC to use discovery to find more victims of sexual harassment in a pattern-or-practice case)).

(emphasis added). The EEOC concedes in its brief that our review of the district court's decision to stay or dismiss an EEOC suit for failure to satisfy Title VII's pre-suit requirements is for abuse of discretion. In its order below, the district court concluded that "[h]ere, dismissal is a severe but appropriate remedy," footnoting that it "might have stayed the instant action for further conciliation in lieu of dismissal" "[h]ad the EEOC not wholly abdicated its role in the administrative process." *CRST Van Expedited, Inc.*, 2009 WL 2524402, at \*19 & n.24. The present record confirms that the EEOC wholly failed to satisfy its statutory pre-suit obligations as to these 67 women, thus we cannot conclude that the district court abused its discretion in dismissing the EEOC's suit.

## B. *Judicial Estoppel*
### 1. *Judicial Estoppel as Applied to Starke, Payne, and Timmons*

The district court also granted summary judgment on the individual claims of Starke, Payne, and Timmons, and also on the EEOC's claims on their behalf. *CRST Van Expedited, Inc.*, 614 F. Supp. 2d at 973–77. Specifically, the district court concluded that, because each of the three women failed to disclose her involvement in the instant lawsuit as a potential source of income on her bankruptcy petition, she is judicially estopped from seeking relief. *Id.* Likewise, the district court also applied judicial estoppel to the EEOC, precluding the EEOC from seeking redress in its own § 706 suit for harassment that Starke, Payne, or Timmons allegedly suffered. *Id.* at 973.

In October 2005, Starke and her husband filed, in the federal bankruptcy court for the Northern District of Texas, a voluntary petition as joint debtors praying for protection under Chapter 7 of the Bankruptcy Code. They did not include a claim for sexual harassment among their contingent assets in their petition, nor did they amend their petition at anytime between December 2005, when Intervener Starke initially filed her administrative charge of discrimination with the EEOC, or March 2006, when the bankruptcy court fully discharged their debts. In December 2008, three

months after intervening in the instant lawsuit and over one year after the EEOC filed it, Starke moved to reopen her and her husband's joint bankruptcy to add the claim as a potential asset.

Similarly, in October 2005, Payne filed, in federal bankruptcy court for the Southern District of Ohio, a voluntary petition under the name of "Christina Sprinkle" for protection under Chapter 13 of the Bankruptcy Code. Payne omitted from her list of assets any potential claim against CRST for sexual harassment. After the EEOC filed the instant lawsuit in September 2007, Payne did not amend her petition's asset schedules to include the claim. On May 24, 2010, Payne received a full discharge.

In March 2008, Timmons and her husband filed, in federal bankruptcy court for the Western District of Missouri, a voluntary petition as joint debtors seeking protection under Chapter 7 of the Bankruptcy Code. Timmons did not disclose any potential cause of action against CRST and, in June 2008, she and her husband received a full discharge.

We review for abuse of discretion a district court's invocation of judicial estoppel. *Triple H Debris Removal, Inc. v. Companion Prop. & Cas. Ins. Co.*, 647 F.3d 780, 785 (8th Cir. 2011) (citing *Capella Univ., Inc. v. Exec. Risk Specialty Ins. Co.*, 617 F.3d 1040, 1051 (8th Cir. 2010)). We apply this deferential standard of review based on our acknowledgment that the district court is best equipped to decide judicial estoppel's applicability "because determining whether a litigant is playing fast and loose with the courts has a subjective element and its resolution draws upon the trier's intimate knowledge of the case at bar and his or her first-hand observations of the lawyers and their litigation strategies." *Stallings v. Hussman Corp.*, 447 F.3d 1041, 1046 (8th Cir. 2006) (quotation, alteration, and citation omitted). We will uphold the district court's decision to apply judicial estoppel "unless it plainly appears that the court committed a clear error of judgment in the conclusion it reached upon a weighing of the proper factors." *Id.* at 1046–47 (quotations and citation omitted).

As an initial matter, we need not address Starke's contention that the district court abused its discretion in judicially estopping her from prosecuting her intervener claims against CRST. Starke alleges in her brief that the district court failed to consider certain mitigating factors counseling against judicial estoppel's application. Specifically, Starke maintains that she inadvertently failed to include her intervener claim in her bankruptcy petition. She claims that the language barrier created by her German birth and consequent lack of fluency in English limited her ability to assist her bankruptcy counsel. Starke also notes that, "as soon as [she] learned that her claim against CRST should have been disclosed, [she] took immediate steps to have the bankruptcy reopened and her filings amended to contain the claim against CRST." However, Starke's counsel conceded at oral argument that Starke lacked standing to assert her Title VII claim.[14] In light of this concession, we need not address Starke's appeal of the district court's decision to judicially estop Starke from pursuing her intervener claims against CRST, and we instead consider only whether the district court abused its discretion in judicially estopping Payne and Timmons.

---

[14]At oral argument, the court inquired as to whether, "in light of the bankruptcy proceeding" and *United States ex rel. Gebert v. Transport Administrative Services*, 260 F.3d 909 (8th Cir. 2001), Starke had standing to pursue her claim. In response, Starke's counsel stated:

> It sounds to me like, in all honesty, she probably never should have been in the district court. There probably never should have been merits of determination against her. There was not only no jurisdiction here, there was no jurisdiction there. Looking at it now, I think we did the best we could. There shouldn't have been merits of determination. It should have been a dismissal without prejudice in the district court. *In all honesty, there is no standing, no jurisdiction ever*. That is how I see that. Thank you.

(Emphasis added.)

-26-

As the Supreme Court has explained, the doctrine of judicial estoppel "'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)). By logical extension, "[j]udicial estoppel [also] prevents a person who states facts under oath during the course of a trial from denying those facts in a second suit, even though the parties in the second suit may not be the same as those in the first." *Stallings*, 447 F.3d at 1047 (quotations and citation omitted). This doctrine "protects the integrity of the judicial process." *Id.* (quotations and citation omitted). Although "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," *id.* (citing *New Hampshire*, 532 U.S. at 750), the Supreme Court, in *New Hampshire v. Maine*, articulated a non-exhaustive list of "[t]hree factors . . . [to] aid a court in determining whether to apply the doctrine," *id.* (citing *New Hampshire*, 532 U.S. at 751).

> "First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Id.* (quoting *New Hampshire*, 532 U.S. at 750–51).

Taking each factor in turn, we conclude that the district court did not abuse its discretion by judicially estopping Payne and Timmons from pursuing their respective

claims insofar as they may seek to subsequently intervene in the EEOC's action or otherwise seek relief individually. Notably, with respect to the first factor concerning a clear inconsistency between former and subsequent positions, we have observed that, "[i]n the bankruptcy context, a party may be judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements." *Id.* Estoppel may apply because "a debtor's failure to list a claim in the mandatory bankruptcy filings is tantamount to a representation that no such claim existed." *Id.* (quotations and citation omitted). As recounted above, none of the women disclosed their involvement or potential involvement in this action.

"The second *New Hampshire* factor requires that the bankruptcy court have adopted the debtor's position." *Id.* at 1048. This factor might be satisfied "where the bankruptcy court issues a 'no asset' discharge," thereby evidencing that "the bankruptcy court has effectively adopted the debtor's position." *Id.* Again, as already noted, Payne, and Timmons each procured a full discharge without disclosing her potential claim against CRST. In contrast, in *Stallings*, we found "no judicial acceptance of Stallings's inconsistent position" because "the bankruptcy court never discharged Stallings's debts based on the information that Stallings provided in his schedules." *Id.* at 1149. Payne filed her bankruptcy petition in 2005, prior to the institution of suit, but that does not spare her from possible judicial estoppel. Under the principles of judicial estoppel, she was still obliged to amend her petition to disclose her involvement or potential involvement in the post-petition lawsuit. *Id.* at 1148. As we stated in *Stallings*,

> a debtor who files h[er] bankruptcy petition, subsequently receives a right-to-sue letter from the EEOC, and then fails to amend h[er] bankruptcy petition to add h[er] lawsuit against h[er] employer as a potential asset is estopped from bringing the lawsuit because the debtor "knew about the undisclosed claims and had a motive to conceal them

from the bankruptcy court." *DeLeon v. Comcar Indus., Inc.*, 321 F.3d 1289, 1291 (11th Cir. 2003).

*Id.*

"Under the final *New Hampshire* factor, the debtor's non-disclosure of the claim must not be inadvertent and must result in the debtor gaining an unfair advantage." *Id.* We have stressed that, pursuant to this third factor, a district court should not judicially estop a debtor whose prior inconsistent position was attributable to "a good-faith mistake rather than as part of a scheme to mislead the court." *Id.* (quotations and citation omitted); *accord New Hampshire*, 532 U.S. at 753 ("We do not question that it may be appropriate to resist application of judicial estoppel when a party's prior position was based on inadvertence or mistake." (quotations and citation omitted)). That said, no evidence of any such good-faith error or omission is present in this case. In fact, some evidence suggests otherwise. As already noted, Starke herself concedes that the district court correctly judicially estopped her. Also, Timmons and her husband filed their joint petition an entire year after the EEOC instituted suit in this matter, indicating, at the very least, that they had notice of Timmons's potential claim.

Finally, as the district court noted, "[t]he actions of . . . Ms. Timmons are especially galling" because she "used the bankruptcy process to discharge or reduce debts *owed to CRST* and now seek[s] to recover funds from CRST free and clear of the bankruptcy process." *CRST Van Expedited, Inc.*, 614 F. Supp. 2d at 975 (citing *New Hampshire*, 532 U.S. at 750). "'Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, *especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him*.'" *New Hampshire*, 532 U.S. at 749 (emphasis added) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).

Accordingly, based on this record, we cannot conclude that the district court abused its discretion in judicially estopping Payne or Timmons from individually pursuing their respective claims against CRST for sexual harassment.

## 2. *Judicial Estoppel as Applied to EEOC*

The district court also invoked judicial estoppel to bar the EEOC from seeking any remedy on Starke's, Payne's, and Timmons's behalf. Specifically, the district court asserted that "[t]he judicial estoppel doctrine applies part-and-parcel to the EEOC, notwithstanding the fact that it is the "master of its own case" and "does not merely stand in the shoes of the allegedly aggrieved persons for whom it seeks relief in this action under [§ 706 of Title VII]." *Id.* at 976.

On appeal, the EEOC argues that the district court abused its discretion in applying judicial estoppel to the EEOC because *the EEOC* did not assert an inconsistent position in a prior proceeding. Rather, the EEOC maintains, the past representations of Intervener Starke, Payne, and Timmons, do not bind the EEOC because, in its present posture as a plaintiff suing in its own name under § 706, "[the] EEOC does not merely stand in their shoes, and [the] EEOC's litigation does not exist simply to seek relief on their behalf." (Citing *Waffle House*, 534 U.S. at 296–98.) According to the EEOC, it "filed this litigation not for the personal benefit of any particular claimant, but for the broader public interest in enforcing Title VII and ensuring CRST maintains a workplace free from discrimination."

In response, CRST concedes that "[n]o federal appellate court has yet ruled on this issue" of whether a court can judicially estop the EEOC from bringing suit in its own name to remedy allegedly unlawful employment practices because those practices were perpetrated against an employee who herself is judicially estopped. CRST urges, nevertheless, that the district court did not abuse its discretion in judicially estopping the EEOC. Noting that judicial estoppel's chief purpose "is to protect the integrity of the judicial process," CRST avers that, "[w]hile the individual

-30-

claimants in an EEOC enforcement action may not technically be parties to the case, their prior inconsistent representations to another court pose no less of a threat to the integrity of the judicial process."

Upon review, we concur with the EEOC that the district court abused its discretion in judicially estopping the EEOC from suing *in its own name* to correct any discriminatory employment practices that CRST allegedly perpetrated against the three women. The district court's and CRST's contrary position is inconsistent with the realities of the EEOC's role as a plaintiff in its own name under § 706 and with the basic principles of the judicial estoppel doctrine.

As the Supreme Court has emphasized, "[g]iven the clear purpose of Title VII, the EEOC's jurisdiction over enforcement, and the remedies available, the EEOC need look no further than § 706 for its authority to bring suit in its name for the purpose, among others, of securing relief for a group of aggrieved individuals." *Gen. Tel. Co.*, 446 U.S. at 324; *see also Occidental Life Ins. Co.*, 432 U.S. at 368 ("The EEOC does not function simply as a vehicle for conducting litigation on behalf of private parties . . . ."). In *Waffle House,* the Supreme Court considered "whether an agreement between an employer and an employee to arbitrate employment-related disputes bars the EEOC from pursuing victim-specific judicial relief, such as backpay, reinstatement, and damages, in an enforcement action alleging that the employer has violated Title I of the . . . ADA."[15] 534 U.S. at 282. The Fourth Circuit had held that, insofar as the EEOC was suing in its own capacity under § 706 to vindicate the public interest in discrimination-free workplaces, the EEOC was limited

---

[15] Although *Waffle House* is technically an ADA case, the Court observed at the outset of its opinion that "Congress has directed the EEOC to exercise the same enforcement powers, remedies, and procedures that are set forth in Title VII . . . when it is enforcing the ADA's prohibitions against employment discrimination on the basis of disability." 534 U.S. at 285 (citing 42 U.S.C. § 12117(a) (1994)). Thus, the Court determined that "the provisions of Title VII defining the EEOC's authority provide[d] the starting point for [its] analysis." *Id.* at 285–86.

to seeking general injunctive relief and could not also seek victim-specific relief on behalf of a victim who himself was subject to a binding arbitration agreement. *Id.* at 290. The Supreme Court reversed, concluding that such an arbitration agreement between the employer and employee did not preclude the EEOC from suing in federal court to seek victim-specific relief relating to the employee's injury. *Id.* at 298. Specifically, the Supreme Court reasoned that "[t]here is no language in the statutes or in either of these cases suggesting that the existence of an arbitration agreement between private parties materially changes the EEOC's statutory function or the remedies that are otherwise available." *Id.* at 288. Moreover, in rejecting the Fourth Circuit's conclusion that the EEOC could not recover victim-specific relief because the employee himself would be ineligible for such recovery by virtue of the binding arbitration agreement, the Supreme Court stated as follows:

> If it were true that the EEOC could prosecute its claim only with [the employee]'s consent, or if its prayer for relief could be dictated by [the employee], the court's analysis might be persuasive. But once a charge is filed, the exact opposite is true under the statute—the EEOC is in command of the process. . . . If . . . the EEOC files suit on its own, the employee has no independent cause of action, although the employee may intervene in the EEOC's suit. . . . The statute clearly makes the EEOC the master of its own case and confers on the agency the authority to evaluate the strength of the public interest at stake.

*Id.* at 291.

Under *Waffle House* a court cannot judicially estop the EEOC from bringing suit in its own name to remedy employment discrimination simply because the defendant-employer happened to discriminate against an employee who, herself, was properly judicially estopped. Indeed, under Title VII, "whenever the EEOC chooses from among the many charges filed each year to bring an enforcement action in a particular case, the agency may be seeking to vindicate a public interest, not simply

provide make-whole relief for the employee, even when it pursues entirely victim-specific relief." *Id.* at 296.

Accordingly, the district court abused its discretion in judicially estopping the EEOC from suing in its own name under § 706 to remedy sexual harassment that CRST allegedly perpetrated against Starke, Payne, and Timmons, and we reverse the district court's grant of summary judgment on that ground accordingly.[16]

### C. *Merits of EEOC's Hostile Work-Environment Claims*
#### 1. *Governing Legal Standard*

The EEOC also appeals several of the district court's dispositive rulings concerning the merits of its hostile work-environment claims against CRST. "Title VII . . . makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). Importantly, "this language is not limited to 'economic' or 'tangible' discrimination." *Id.* (citation and internal quotations omitted). Rather, as the Supreme Court has observed, "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Id.* (citation and internal quotations omitted); *accord Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir. 1999). Thus,

---

[16]Although the district court abused its discretion in judicially estopping the EEOC from suing in its own name under § 706 to remedy sexual harassment that CRST allegedly perpetrated against, *inter alia*, Payne and Timmons, we nevertheless affirm (1) the district court's grant of summary judgment, in CRST's favor, on the EEOC's hostile work-environment claim on Payne's behalf, *see infra* Part II.C.2., and (2) the district court's grant of summary judgment, in CRST's favor, based on its conclusion that, as a matter of law, CRST promptly and effectively remedied the sexual harassment once it became aware of it, as to Timmons, *see infra* Part II.C.3.

"[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Id.* (internal citations and quotations omitted).

As we have explained,

> [h]ostile work environments created by supervisors or coworkers have the following elements in common: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment. *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005). In addition, for claims of harassment by non-supervisory personnel, [the plaintiff] must show that [her] employer knew or should have known of the harassment and failed to take proper action.

*Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1194–95 (8th Cir. 2006). Critically, "[CRST] cannot be vicariously liable for sexual harassment [perpetrated] by non-supervisory coworkers." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 419 (8th Cir. 2010).

> On the other hand, if the harassment was committed by an employee who supervised [the plaintiff], [CRST] as her employer is vicariously liable for the harassment unless it can establish the affirmative defense defined in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) [(hereinafter, the "*Ellerth-Faragher* Defense")].

*Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004). Under the *Ellerth-Faragher* Defense, CRST may avoid vicarious liability for a supervisory employee's

harassment if it satisfies "'two necessary elements: (a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior[ ] and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Weger v. City of Ladue*, 500 F.3d 710, 718 (8th Cir. 2007) (quoting *Williams v. Mo. Dep't of Mental Health*, 407 F.3d 972, 976 (8th Cir. 2006)).

Thus, we must determine, as a threshold matter, whether CRST's Lead Drivers served as supervisors for CRST's trainees or were merely the trainees' coworkers. *See Alvarez*, 626 F.3d at 419. The district court determined that Lead Drivers did not serve as the trainees' supervisors. In contrast, the EEOC maintained before the district court, as it does here on appeal, that a CRST Lead Driver is a "supervisor" in every practical sense of the word. Specifically, the EEOC avers that "CRST gives [Lead Drivers] virtually unchecked authority and control over all aspects of a trainee's daily activities, as well as authority to recommend whether a trainee is ready for full-driver status, and their recommendations are virtually always followed." CRST counters that "the functions and powers that [the] EEOC attributes to [L]ead [D]rivers are no greater than those of the team leaders and foreman that this court has held are not supervisors."

Applying our precedent, we agree with the district court that CRST's Lead Driver is not a supervisory employee. Therefore, CRST is not vicariously liable for any harassment that its Lead Drivers allegedly perpetrated against female trainees. "[T]o be considered a supervisor, 'the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties.'" *Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1057 (8th Cir. 2004) (quoting *Joens*, 354 F.3d at 940). It is undisputed that none of CRST's Lead Drivers wielded any such power. On the contrary, the record reflects that, at best, CRST's Lead Drivers could only (1) dictate minor aspects of the trainees' work experience, such as

scheduling rest stops during the team drive and (2) issuing a non-binding recommendation to superiors at the training program's conclusion concerning whether CRST should upgrade the trainee to full-driver status. Under our case law, neither of these prerogatives makes a Lead Driver the trainee's "supervisor."

First, our circuit has held that "[t]he fact that an alleged harasser may have been a 'team leader' with the authority to assign employees to particular tasks will not be enough to make that person a supervisor." *Merritt v. Albemarle Corp.*, 496 F.3d 880, 883 (8th Cir. 2007) (quotations and citation omitted). Thus, in *Weyers*, we declined to designate a "team leader" a supervisor because, "[a]lthough [the alleged harasser] had the authority as team leader to assign employees to particular tasks, he could not reassign them to significantly different duties." *Weyers*, 359 F.3d at 1057. Similarly, in *Meritt*, we refused to recognize the allegedly harassing "reliability technician," 496 F.3d at 881, as a supervisor because "[h]is authority was restricted to assigning [the plaintiff] to work on various tasks that were part of her work duties," *id.* at 884. The same holds true here. The EEOC has adduced no evidence suggesting that a CRST Lead Driver possessed the power to do anything more than assign a trainee to specific tasks already within that trainee's normal, day-to-day duties.

Second, CRST's reliance, in part, on a Lead Driver's evaluation of a trainee's performance to decide whether to promote that trainee to full-driver status is insufficient to render a Lead Driver a supervisor. Although the Supreme Court declined, in *Ellerth* and *Faragher*, to "answer the question, 'who is a supervisor?,'" *Joens*, 354 F.3d at 940, it did observe that a "tangible employment decision . . . may be subject to review by higher level supervisors," *Ellerth*, 524 U.S. at 762. Indeed, the EEOC relies on this very observation in *Ellerth* to support its own assertion that "[i]t is immaterial that CRST may, on occasion, not follow a trainer's recommendation." However, the EEOC's argument in this regard fails for two reasons. First, aside from its bare assertion, the EEOC offers no evidence that CRST simply "rubber stamped" its Lead Drivers' recommendations. *See Staub v. Proctor*

*Hosp.*, __U.S.__, 131 S. Ct. 1186, 1194 (2011) (holding that if a non-decisionmaker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer has "cat's paw" liability). Second, we have concluded, under almost identical circumstances, that a coworker's authority to make mere *recommendations* or evaluations to a superior about tangible employment decisions pertaining to a fellow employee does not constructively promote that coworker to a supervisor for purposes of vicarious Title VII liability. *See, e.g.*, *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 851 (8th Cir. 2005) (holding that a harassing foreman was merely his victim's coworker, and not the victim's supervisor, because the foreman's own supervisor possessed the authority to hire, fire, and promote the laborers, and "although [the foreman's supervisor] may have consulted with [the harassing foreman] on such matters, the record [was] clear that [the harassing foreman] lacked any such authority"); *Weyers*, 359 F.3d at 1057 ("While it is true that [the alleged harasser] signed at least three of [the plaintiff's] initial performance evaluations and that [the supervisor] acknowledged that he had based his decision to terminate [the plaintiff] at least in part on [the plaintiff's] job[-]evaluation scores, [the alleged harasser] himself did not have the authority to take tangible employment action against [the plaintiff].").

Finally, we reject the EEOC's suggestion that, "[a]t a minimum, the authority CRST vests in its trainers creates a basis for liability under the apparent authority doctrine." This court has consistently affirmed that a harassing coworker's "apparent authority would be an insufficient basis to support a finding of supervisor status." *Weyers*, 359 F.3d at 1057 n.7; *accord Cheshewalla*, 415 F.3d at 851 (reaffirming that "[an employee's] belief that [her harassing coworker] possessed the authority of a supervisor does not alter our conclusion" that the harasser is a coworker nonetheless (citing *Weyers*, 359 F.3d at 1057 n.7)).

-37-

Thus, we concur with the district court that CRST's Lead Drivers were their trainees' coworkers, not their supervisors. Consequently, CRST cannot be vicariously liable for any sexual harassment in which its Lead Drivers engaged, and the *Ellerth-Faragher* Defense is inapplicable to the instant case. *See Alvarez*, 626 F.3d at 419.

In order to withstand summary judgment on its hostile work-environment claims against CRST, the EEOC must create genuine issues of material fact as to the following elements regarding each allegedly aggrieved female trucker:

> "(1) [that she belongs to] a protected group; (2) [that she suffered] unwelcome harassment; (3) [that there was] a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of [her] employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action."

*Sheriff v. Midwest Health Partners, P.C.*, 619 F.3d 923, 929 (8th Cir. 2010) (alterations in original) (quoting *Carter*, 173 F.3d at 700). Given these elements, we next address the district court's summary-judgment rulings against the EEOC on its hostile work environment claims.

### 2. *The Severity or Pervasiveness of Certain Harassment*

The district court granted CRST summary judgment on the EEOC's hostile work-environment claims on behalf of three women,[17] concluding that, as a matter of law, each alleged harassment that was neither sufficiently severe nor pervasive to support a hostile work-environment claim. The district granted CRST summary judgment on the EEOC's claims on behalf of 11 additional women,[18] again citing,

---

[17]Victoria Holmes, January Jackson, and Tillie Jones.

[18]Dorothy Dockery, Debra Hindes, Tracy Hughes, Patricia Marzett, Virginia Mason, Lucinda McBlair, Sherry O'Donnell, Christina Payne, Peggy Pratt, Jonne

*inter alia*,[19] insufficient severity or pervasiveness as a matter of law. The EEOC appeals these rulings, maintaining that the summary-judgment record contains enough evidence to create a fact question regarding the severity or pervasiveness of the harassment that each woman suffered.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We review *de novo* the district court's grant of summary judgment, viewing the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Mayer v. Countrywide Home Loans*, 647 F.3d 789, 791 (8th Cir. 2011).

On each female trucker's behalf, the EEOC must create a genuine issue of material fact concerning whether "the harassment affected a term, condition, or privilege of [her] employment." *Carter*, 173 F.3d at 700. "Such discrimination extends beyond terms and conditions in the 'narrow contractual sense' and includes discriminatory harassment *so severe or pervasive* as to alter the conditions of employment and create a hostile working environment." *Id.* (emphasis added) (citing *Faragher*, 524 U.S. at 786; *Meritor Sav. Bank, FSB*, 477 U.S. at 67). "There can be no doubt federal harassment standards are demanding. . . . Indeed, the Supreme Court has 'made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment.'" *Al-Zubaidy*, 406 F.3d at 1038 (quoting *Faragher*, 524 U.S. at 788) (internal citation omitted). Only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

---

Shepler, and Linda Skaggs.

[19]The district court alternatively concluded, as a matter of law, that nine of these 11 additional women—all except Payne and Skaggs—either (a) failed to timely and properly notify CRST of the harassment that they suffered, thereby depriving CRST of the opportunity to remedy it, or (b) did timely and properly notify CRST of the harassment, but the company promptly and effectively remedied it.

pervasive to alter the conditions of the victim's employment and create an abusive working environment [is] Title VII violated." *Harris*, 510 U.S. at 21 (internal quotations and citations omitted). Conversely, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.*

"A number of factors are relevant in assessing the magnitude of harassment, including the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating or only an offensive utterance, [and] whether it unreasonably interferes with the employee's work performance . . . ." *Carter*, 173 F.3d at 702. We also consider a harassment victim's "physical proximity to the harasser[] and the presence or absence of other people." *Id.* (internal citations omitted). Proximity and the absence of others are relevant here given the confined quarters and remote setting in which CRST's trainees worked with their Lead Drivers. "Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." *Sheriff*, 619 F.3d at 931.

Applying these standards we conclude that, except as to two women—Sherry O'Donnell and Tillie Jones—the district court did not err in granting CRST summary judgment after determining that the women complained of harassment that was neither sufficiently severe nor pervasive. The record reveals complaints about their Lead Drivers' poor personal hygiene,[20] boasting about past sexual exploits, sporadic remarks of sexual vulgarity, and highly offensive but isolated instances of propositioning for sex. None of the relevant factors listed above, including the women's "physical proximity to [their] harasser[s] and the presence or absence of

---

[20]By way of example, several women complained that, to minimize stops while in transit, their male Lead Drivers habitually urinated in plastic bottles with no regard for their female trainee, who often heard or even smelled the foul activity.

other people," *Carter*, 173 F.3d at 702, meet the applicable standard that the alleged harassment was so severe or pervasive that it "alter[ed] the conditions of the [women's] employment." *Harris*, 510 U.S. at 21 (internal quotations and citations omitted). Regarding the Lead Drivers' poor hygienic practices, we have noted that "Title VII . . . is not a general civility code for the American workplace." *Wilkie v. Dep't of Health & Human Servs.*, 638 F.3d 944, 953 (8th Cir. 2011) (quotations and citation omitted); *accord Faragher*, 524 U.S. at 788. Although a Lead Driver's poor hygiene undoubtedly made for an unpleasant work environment, this "[m]erely rude or unpleasant conduct is insufficient to support a claim" for hostile work environment. *Id.* (quotations and citation omitted). As for the boasting about past sexual exploits and sporadic, sexually vulgar remarks, a de novo review reveals that they mostly constituted "mere offensive utterance[s]," *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1127 (8th Cir. 2000) (quotations and citation omitted), and we have cautioned that "[s]poradic or casual comments are unlikely to support a hostile environment claim," *Carter*, 173 F.3d at 702. With respect to the isolated propositioning, this court and the Supreme Court have stated that "'[m]ore than a few isolated incidents are required'" to support a hostile work-environment claim. *Clearwater*, 231 F.3d at 1127 (quoting *Meritor Sav. Bank*, 477 U.S. at 67). Consequently, the district court did not err in concluding, as a matter of law, that 12 women did not suffer sufficiently severe or pervasive harassment to survive summary judgment.

The EEOC did, however, establish material issues of fact regarding the harassment that O'Donnell and Jones allegedly suffered. We hold that the district court erred in concluding, as a matter of law, that the harassment they suffered was insufficiently severe or pervasive. O'Donnell testified in her deposition that, among others, co-driver Anthony Sears subjected her to persistent sexual harassment during the seven days that she spent with him over the road. Specifically, O'Donnell testified that, over the course of that seven-day trip, Sears (1) asked her, on "three to five" occasions, to drive naked; (2) refused O'Donnell's repeated requests to exit at a truck

-41-

stop so she could go to the bathroom, ordering her to urinate in a parking lot instead; and (3) in a culminating incident, grabbed O'Donnell's face while she was driving and began screaming that "all he wanted was a girlfriend." Regarding this third incident, O'Donnell testified that Sears grabbed her face so vigorously that it caused one of her teeth to lacerate her lip. Viewing all facts and drawing all inferences therefrom in the light most favorable to the EEOC, as we must, *Mayer*, 647 F.3d at 791, this testimony creates a genuine fact issue as to the severity of the harassment that O'Donnell allegedly suffered. Given that Sears allegedly perpetrated all of these acts in a week's time, the conduct was frequent. *See Carter*, 173 F.3d at 702. Sears's directive that O'Donnell publicly urinate in a parking lot is a patent attempt at humiliation. *See id.* (citation omitted). Moreover, Sears's act of grabbing O'Donnell's face, was, by its very nature, "physically threatening." *Id.* Finally, upon assessing these characteristics of Sears's alleged conduct in light of O'Donnell's physical proximity to Sears and the absence of other people, we must conclude that the EEOC has produced enough evidence of severity of O'Donnell's alleged harassment to make it a question for the jury. *See Sheriff*, 619 F.3d at 931 ("Once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury.").[21]

The district court erred in concluding, as a matter of law, that Tillie Jones suffered harassment that was neither sufficiently severe nor pervasive. Jones testified that, on three or four occasions over the course of a two-week training trip, her Lead Driver, James Simmons, entered the cab wearing only his underwear and rubbed the back of her head, despite repeated requests by Jones that he stop. Jones also testified that, "everyday," Simmons entered the cab in his underwear while she was driving. Additionally, according to Jones, Simmons called her "his bitch" five or six times,

---

[21]Still, as we explain in Part II.C.3 *infra*, the district court did not err in granting summary judgment on the EEOC's claim on O'Donnell's behalf because CRST took prompt and effective remedial action when O'Donnell complained about Sears's conduct.

including on one occasion when, in response to Jones's complaints about his slovenly habits, he ordered Jones to clean up the truck, declaring "that's what you're on the truck for, you're my bitch. I ain't your bitch. Shut up and clean it up." Finally, Jones testified that, like many of CRST's Lead Drivers, Simmons routinely urinated in plastic bottles and ziplock bags while in transit. However, Jones testified that Simmons would leave his urine receptacles about the truck's cab and that when Jones implored Simmons to gather them, Simmons ordered her to "shut up and clean it up." No overt physical threat or contact was present, but the evidence suffices to create a genuine issue of material fact concerning the severity or pervasiveness of the harassment which the EEOC alleges that Jones suffered.

In sum, we affirm the district court's summary judgment, in CRST's favor, on the EEOC's hostile work-environment claims on behalf of 12 women,[22] concurring in the district court's conclusion that, as a matter of law, the alleged harassment was neither sufficiently severe nor pervasive. However, we reverse the district court's grant of summary judgment as to the EEOC's claims on behalf of Tillie Jones. We conclude that the EEOC created a genuine issue of material fact as to the severity or pervasiveness of the harassment that Jones allegedly suffered. Finally, although we also conclude that the EEOC has created a genuine fact issue as to the severity or pervasiveness of the harassment that Sherry O'Donnell allegedly suffered, for the reasons stated in Part II.C.3. *infra*, we affirm the district court's grant of summary judgment on the EEOC's claims on her behalf.

---

[22]Dorothy Dockery, Debra Hindes, Victoria Holmes, Tracy Hughes, January Jackson, Patricia Marzett, Virginia Mason, Lucinda McBlair, Christina Payne, Peggy Pratt, Jonne Shepler, and Linda Skaggs.

### 3. *CRST's Notice and/or Remedying of the Alleged Harassment*

The EEOC also appeals the district court's grant of summary judgment on its claims as to 34 women[23] who, according to the district court, either (1) allege harassment that CRST neither knew nor should have known about or (2) allege harassment that CRST, upon being notified of, promptly and effectively remedied. Specifically, the district court granted summary judgment on the EEOC's claims concerning 11 women, *see supra* n.5, and some days later granted summary judgment as to 22 more. Additionally, in its order granting CRST summary judgment on the EEOC's claims on behalf of January Jackson for insufficient severity or pervasiveness, the district court alternatively concluded that CRST neither knew nor should have known about her harassment.

We have already affirmed the district court's grant of summary judgment affecting nine[24] of these 34 women based on its alternative conclusion that their alleged harassment was not sufficiently severe or pervasive. *See supra* Part II.C.2. Therefore, we need not address whether CRST knew or should have known about the harassment that those nine women suffered. *See Alvarez*, 626 F.3d at 419 ("When an employee complains about inappropriate conduct that does not rise to the level of a violation of law, . . . there is no liability for a failure to respond.").

---

[23]Antoinette Baldwin, Bonnie Batyik, Mary Beaton, Bethany Broeker, Kim Chisholm, Catherine Coronado, Samantha Cunningham, Denise Desonier, Dorothy Dockery, Maybi Fernandez-Fabre, Catherine (Granofsky)-Fletcher, Debra Hindes, Tracy Hughes, January Jackson, Ginger Laudermilk, Patricia Marzett, Virginia Mason, Lucinda McBlair, Verona McIver, Bonnie Moesch, Sherry O'Donnell, Tammi Pile, Sharon Pinchem, Peggy Pratt, Danette Quintanilla, Kathleen Seymour, Faith Shadden, Jonne Shepler, Mary "Emily" Smith, Jennifer Susson, Robin Timmons, Rachel Tucker, Diana Vance, and Betsy Ybarra.

[24]Dorothy Dockery, Debra Hindes, Tracy Hughes, January Jackson, Patricia Marzett, Virginia Mason, Lucinda McBlair, Peggy Pratt, and Jonne Shepler.

As to the remaining 25 women,[25] we conducted a de novo review of all record evidence. Based on that review we hold that the EEOC failed, as a matter of law, to investigate and/or conciliate its claims on behalf of four of them—Bonnie Batyik, Bethany Broeker, Verona McIver, and Diana Vance. Specifically, each woman complains of harassment that CRST allegedly perpetrated after the filing of the instant lawsuit on September 27, 2007.[26] We reserve the right to affirm a district court's grant of summary judgment on any ground that the summary-judgment record supports. *W3i Mobile, LLC v. Westchester Fire Ins. Co.*, 632 F.3d 432, 436 (8th Cir. 2011). Accordingly, as to these four women, we will affirm the district court's grant of summary judgment on the alternative ground that the EEOC failed to discharge its pre-suit duties under Title VII to investigate and conciliate these claims, as they did not even accrue until after the EEOC had instituted the action. *See supra* Part II.A.2.

Regarding the remaining 21 women, because the women's Lead Drivers and co-drivers were their coworkers rather than their supervisors, *see supra* Part II.C.1., the

---

[25]Antoinette Baldwin, Bonnie Batyik, Mary Beaton, Bethany Broeker, Kim Chisholm, Catherine Coronado, Samantha Cunningham, Denise Desonier, Maybi Fernandez-Fabre, Catherine (Granofsky)-Fletcher, Ginger Laudermilk, Verona McIver, Bonnie Moesch, Sherry O'Donnell, Tammi Pile, Sharon Pinchem, Danette Quintanilla, Kathleen Seymour, Faith Shadden, Mary "Emily" Smith, Jennifer Susson, Robin Timmons, Rachel Tucker, Diana Vance, and Betsy Ybarra.

[26]In her deposition, Batyik admitted that she did not even begin working at CRST until January 24, 2008, and alleges that Lead Driver David Buckner sexually harassed her for four weeks from January 27, 2008, until February 25, 2008. Similarly, Broeker concedes she did not commence employment with CRST until August 4, 2008, and that the EEOC's claims on her behalf stem from harassment that she allegedly suffered at the hands of Lead Driver Sean Pourfahm, from August 13, 2008, until August 15, 2008. McIver began her second stint of employment with CRST in November 2007 and alleges that Lead Driver Henry Nei sexually harassed her from February 15, 2008, until February 22, 2008. Finally, Diana Vance began her employment on June 11, 2008, and alleges sporadic harassment throughout her employment until her termination on August 6, 2008.

EEOC must, as part of its burden on summary judgment, create a genuine issue of material fact as to whether CRST "[(1)] knew or should have known of the harassment *and* [(2)] failed to take prompt and effective remedial action." *Carter*, 173 F.3d at 693 (emphasis added). Stated another way, "[CRST] may be directly liable for its employees' actions that violate Title VII if the company knows or should have known of the conduct, *unless* it can show that it took immediate action and appropriate corrective action." *Alvarez*, 626 F.3d at 419 (emphasis added) (quotations and citation omitted). Regarding the 25 women in question, our de novo review of the EEOC's claims concerning each woman confirms the district court's conclusion that no fact issue remained because (1) CRST neither knew nor should have known about the alleged harassment to remedy it because the woman failed to report it soon enough, or at all; or (2) the woman timely reported the harassment, and CRST promptly and effectively remedied it.

With respect to CRST's knowledge, we have stated that either an employer's actual or constructive notice of ongoing coworker-on-coworker harassment may subject the employer to direct liability for that harassment unless the employer takes prompt corrective action. *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009). "An employer has actual notice of harassment when sufficient information either comes to the attention of someone who has the power to terminate the harassment, or it comes to someone who can reasonably be expected to report or refer a complaint to someone who can put an end to it." *Id.* at 802 (citation omitted). Simply put, "[i]n the context of sexual harassment claims, '[a]ctual notice is established by proof that management *knew* of the harassment.'" *Id.* (second alteration in original) (quoting *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1259 (11th Cir. 2003)). Constructive notice is established in the following circumstances: "[(1)] where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer, or [(2)] where the harassment is so pervasive and open that a reasonable employer would

have had to be aware of it." *Id.* (quoting *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 294 (3d Cir. 1999)).

Of the remaining 21 women, we conclude, as a matter of law, that CRST lacked *actual* notice as to ten of them.[27] Specifically, each of these ten women either never reported the alleged sexual harassment to CRST or reported it too late to afford CRST a reasonable opportunity to promptly and effectively address it. We note that, "[i]n some cases, . . . an employee may be excused for a delay in reporting harassment, if the employee can demonstrate a truly credible threat of retaliation." *Alvarez*, 626 F.3d at 422 (quotations and citation omitted). However, a thorough review of each woman's deposition testimony confirms that the EEOC has failed to demonstrate that any of these ten women faced such a credible threat.[28] Thus, CRST lacked actual notice because the EEOC has produced no evidence "that management *knew* of the harassment." *Sandoval*, 578 F.3d at 802 (quotations and citation omitted).

Furthermore, on the present record, we must also conclude, as a matter of law, that CRST lacked constructive knowledge of any harassment that the ten women allegedly suffered. The EEOC's argument to the contrary is linked to its separate contention that the district court abused its discretion in excluding documentary

---

[27]Antoinette Baldwin, Kim Chisholm, Catherine Coronado, Maybi Fernandez-Fabre, Catherine (Granofsky)-Fletcher, Bonnie Moesch, Tammi Pile, Sharon Pinchem, Rachel Tucker, and Betsy Ybarra.

[28]In fact, the only woman before us whose record demonstrates such a credible threat is Bonnie Batyik, who testified in her deposition that her harasser, Lead Driver Phillip Buckner, threatened that "if [she] told Bill, the dispatch, or anyone, basically, that [the harassment] would go to another level and that it wouldn't be good for [her] so [she] should keep [her] mouth shut." This is the type of "credible threat" that we recognize as excusing an employee's failure to promptly report harassment by a coworker. Nevertheless, as already noted, summary judgment on the EEOC's claims concerning Batyik is appropriate because the EEOC failed to investigate and conciliate them as Title VII requires. *See supra* Part II.C.3.

-47-

evidence pertaining to the 99 women for whom the district court precluded the EEOC from seeking relief. Specifically, as a discovery sanction for the EEOC's failure to present these 99 women to CRST for deposition, the district court—as it had forewarned in a prior order—precluded each woman from testifying at trial and barred the EEOC from seeking relief on her behalf in the instant case. However, in opposing CRST's motion for summary judgment concerning the company's constructive notice of harassment, the EEOC included records of these 99 women's harassment complaints to CRST, their Qualcomm messages, and other documentary evidence. CRST moved to strike this evidence from the summary-judgment record, citing the district court's discovery sanction. The district court subsequently granted the motion, concurring with CRST that permitting the EEOC to introduce evidence of the 99 women's complaints would amount to an "end-run" around its discovery sanction precluding the EEOC's relief on their behalf. *CRST Van Expedited, Inc.*, 2009 WL 2524402, at *16. On appeal, the EEOC maintains that (1) the district court abused its discretion by excluding this evidence pursuant to its prior discovery sanction, and (2) should we reverse the district court and order the inclusion of the evidence in the summary-judgment record, that we also reverse the district court's grant of summary judgment in light of the new evidence—evidence that the EEOC avers is relevant to whether CRST possessed constructive knowledge of allegedly rampant harassment in its training program. *See Sandoval*, 578 F.3d at 802–03 (concluding that, in light of plaintiffs' allegations that the employer "was aware of nearly one hundred similar [sexual-harassment] complaints made during the time plaintiffs were employed," "the district court erred in disregarding," on summary judgment, "the evidence of widespread sexual harassment," as such evidence is "highly relevant to prove the sexual harassment was severe and pervasive and that [the employer] had constructive notice").

Although we review the district court's grant of summary judgment de novo, *Mayer*, 647 F.3d at 791, "[w]e review the district court's imposition of discovery sanctions for abuse of discretion," *Sentis Grp., Inc. v. Shell Oil Co.*, 559 F.3d 888,

898 (8th Cir. 2009) (quotations and citation omitted). The undisputed record reflects that, after protracted discovery, the district court ordered the EEOC, by a certain date, to present for deposition all allegedly aggrieved women. Moreover, the district court directed that "[i]f the EEOC fails to make a woman available, as a discovery sanction *the court will not permit her to testify at trial* and will bar the EEOC from seeking relief on her behalf in this case." *EEOC v. CRST Van Expedited, Inc.*, 257 F.R.D. 513, 519 (N.D. Iowa 2008) (emphasis added). The EEOC concedes that it failed to present for deposition the 99 women. In response to a party's failure to obey such a discovery order, the Federal Rules of Civil Procedure plainly authorizes a district court to "prohibit the disobedient party from supporting or opposing designated claims or defenses, *or from introducing designated matters in evidence*." Fed. R. Civ. P. 37(b)(2)(A)(ii) (emphasis added). Notably, the EEOC does *not* appeal the propriety of the discovery sanction *itself*, but only the district court's enforcement of it. Citing our decision in *Sandoval*, 578 F.3d at 802–03, the EEOC emphasizes the excluded evidence's purported relevance to the question of whether CRST was on constructive notice of the alleged harassment. However, the EEOC offers no direct support for its contention that, by enforcing its own discovery sanction—whose propriety the EEOC does *not* appeal—the district court abused its discretion. Likewise, on this record, we find no evidence that the district court abused its discretion by enforcing its own valid discovery sanction.

Consequently, in granting summary judgment based on its conclusion that, as a matter of law, CRST lacked constructive notice as to the ten women presently at issue, the district court did not premise its ruling on an incomplete summary-judgment record. Moreover, our de novo review of this record reveals no fact issue as to CRST's constructive notice. Specifically, the EEOC has failed to adduce sufficient evidence to create a fact issue as to whether "the harassment was so broad in scope, and so permeated the workplace, *that it must have come to the attention of someone authorized to do something about it*." *Id.* at 802 (quotations and citation omitted).

-49-

With respect to the remaining 11 women,[29] we affirm the district court's grant of summary judgment based on its conclusion that, as a matter of law, CRST promptly and effectively remedied the sexual harassment once it became aware of it. "If an employer responds to harassment with prompt remedial action calculated to end it, then the employer is not liable for the harassment." *Alvarez*, 626 F.3d at 421. In assessing the reasonableness of an employer's remedial action, the factors to be considered "include the amount of time that elapsed between the notice and remedial action, the options available to the employer, . . . and whether or not the measures ended the harassment." *Id.* (alteration in original, quotations and citation omitted). After reviewing the record pertaining to these 11 women in the light most favorable to the EEOC, we hold that CRST effectively and promptly remedied the harassment once the women reported it.

The record reflects that CRST addressed reported harassment by (1) removing the woman from the truck as soon as practicable, arranging overnight lodging at a motel and subsequent transportation to a CRST terminal at the company's expense; (2) requesting a written statement from the woman; (3) relieving the woman from future assignments with the alleged harasser; and (4) reprimanding the alleged harasser and barring him from team-driving with women indefinitely. These actions, not necessarily in combination, constitute the type of prompt and effective remedial action that our precedents prescribe. When considering the "[remedial] options available to the employer," we have included "employee training sessions, *transferring the harassers*, *written warnings*, *reprimands in personnel files*, or termination," as acceptable options, depending on the particulars of the case. *Carter*, 173 F.3d at 702 (emphasis added). In each of the 11 women's cases, CRST removed the woman from the alleged harasser's truck within 24 hours of the harassment being

_____

[29]Mary Beaton, Samantha Cunningham, Denise Desonier, Ginger Laudermilk, Sherry O'Donnell, Danette Quintanilla, Kathleen M. Seymour, Faith Shadden, Mary Smith, Jennifer Susson, and Robin Timmons.

reported, and often much sooner. *See Alvarez*, 626 F.3d at 421 ("Employees often must tolerate some delay . . . so that an employer can gauge the credibility of the complainant and the seriousness of the situation.") (quotations and citation omitted). Moreover, each woman confirmed that they did not suffer any harassment subsequent to their removal.

Accordingly, we affirm the district court's summary judgment as to the remaining 11 women, concurring in its conclusion that, as a matter of law, CRST promptly and effectively remedied any alleged harassment that the women reported.

### D. *Intervener Peeples's Claims*

Peeples appeals the district court's grant of summary judgment to CRST on her hostile work-environment and retaliation claims under Title VII, as well as her state-law claim under the Iowa Civil Rights Act (ICRA). "Consistent with our precedent, the district court concluded that the [ICRA] is interpreted in the same way as Title VII." *Alvarez*, 626 F.3d at 416 n.2. The district court correctly concluded that Peeples's Title VII and ICRA hostile work-environment claims failed as a matter of law "because she did not report the sexual harassment to CRST in a timely manner." *CRST Van Expedited, Inc.*, 2009 WL 1586193, at \*15. Peeples delayed reporting the alleged sexual harassment until after she voluntarily left her harasser's truck. Additionally, for the reasons stated in Part II.C.3 *supra*, the district court properly concluded that there is insufficient evidence in the record to create a fact issue concerning CRST's constructive notice.

We also conclude that the district court *did not* err in granting summary judgment on Peeples's Title VII and ICRA retaliation claims. "This court analyzes ICRA retaliation claims under the same method as federal retaliation claims." *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) (quotations and citation omitted). The district court concluded that "[a] reasonable jury could not find a causal connection between Ms. Peeples's complaint about [her harasser's]

conduct and any adverse employment action." *CRST Van Expedited, Inc.*, 2009 WL 1586193, at \*15. We agree with the district court's conclusion. "Title VII makes it unlawful for an employer to discriminate against an employee because she has 'opposed any practice made an unlawful employment practice,' or has made a charge or participated in an investigation or proceeding under the statute." *Alvarez*, 626 F.3d at 416 (quoting 42 U.S.C. § 2000e-3(a)). Specifically, Peeples must demonstrate that the protected conduct in which she engaged "was a determinative factor in the employer's materially adverse employment action." *Id.* "Because the factual record was fully developed in connection with the motion for summary judgment, we address directly whether [Peeples] has presented a genuine issue of material fact for trial on the ultimate question of discrimination *vel non*." *Id.* Thus, "[t]he key question here is whether [Peeples] presented sufficient evidence to support a conclusion that [CRST's] proffered reason for [terminating] her was pretext for a retaliatory motive." *Id.*

Peeples failed to establish a fact issue that CRST's proffered reason for her termination was pretextual. CRST asserts that it discharged Peeples because newly diagnosed cervical cancer prevented her from working. The undisputed record reflects that she was unable to operate her truck under CRST's demanding team-driving regimen because of her frequent cervical bleeding and subsequent chemotherapy and radiation treatments. As support for her claim that CRST's reason was pretextual, she relies on a comment by Robin Knight, the replacement Lead Driver, that referred to Peeples as "his problem child." Additionally, Peeples relies on the temporal proximity of her discharge to her complaint, noting that CRST terminated her approximately one month after her complaint. This evidence supports mere speculation not a reasonable conclusion of pretext. With respect to the temporal proximity, we note that within a few days of Peeples leaving her harasser's truck, CRST granted her request for a female Lead Driver and immediately put her back out on the road. It is undisputed that on September 20, 2005, a Texas doctor issued a second opinion that her proper diagnosis was cervical cancer.

-52-

On these facts, the district court properly concluded that a reasonable jury could not conclude that CRST's proffered reason for terminating Peeples's employment was pretextual. Accordingly, we affirm the district court's grant of summary judgment on her Title VII and ICRA retaliation claims.

E. *Attorneys' Fees*

Finally, the EEOC contends on appeal that the district court abused its discretion by awarding CRST $4,467,442.90 in attorneys' fees and expenses, pursuant to 42 U.S.C. § 2000e-5(k) and 28 U.S.C. § 1920. "A *prevailing* defendant in a discrimination suit under Title VII of the Civil Rights Act of 1964 may recover attorneys' fees if the plaintiff's case was frivolous, unreasonable, or without foundation." *EEOC v. Kenneth Balk & Assocs., Inc.*, 813 F.2d 197, 198 (8th Cir. 1987) (citing *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22 (1978). "[W]e will grant prevailing party status to a Title VII defendant only in very narrow circumstances." *Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*, 26 F.3d 842, 852 (8th Cir. 1994). In light of our reversals of a couple of the district court's summary-judgment orders, CRST is no longer a "prevailing" defendant because the EEOC still asserts live claims against it. *See id.* ("Where there are disputed issues of fact, it is necessarily impossible to prove that a plaintiff's case is meritless shy of a full-blown trial on the merits which might reveal that the plaintiff's case was 'without foundation.'"). Accordingly, we will vacate, without prejudice, the district court's award of attorneys' fees and expenses pursuant to 42 U.S.C. § 2000e-5(k).

III. *Conclusion*

Based on the foregoing, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. Specifically, we reverse the district court's grant of summary judgment on the EEOC's claims as to Monika Starke because the EEOC, suing as a plaintiff in its own name under § 706, may not be

judicially estopped because of Starke's independent conduct.[30] Additionally, we reverse the district court's grant of summary judgment on the EEOC's claims on behalf of Tillie Jones because the EEOC has produced sufficient evidence to create a genuine fact issue as to the severity or pervasiveness of harassment that she allegedly suffered. Finally, we vacate, without prejudice, the district court's award of attorneys' fees to CRST because, in light of these aforementioned rulings, CRST is no longer a "prevailing" defendant under 42 U.S.C. § 2000e-5(k). We affirm the remainder of the district court's orders and remand for further proceedings consistent with this opinion.

MURPHY, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent from the majority's conclusion that the EEOC failed to fulfill its litigation prerequisites in this case and the resulting dismissal of trial worthy sexual harassment claims. The majority imposes a new requirement that the EEOC must complete its presuit duties for each individual alleged victim of discrimination when pursuing a class claim. This rule places unprecedented obligations on the EEOC and in effect rewards CRST for withholding information from the Commission. In addition I dissent from the holding that CRST's lead drivers are not supervisors of the women trainees assigned to their long haul trips. In other respects I join in the majority opinion.

The EEOC was drawn into this case by Monika Starke's charge that she was sexually harassed while employed by CRST. The Commission then asked CRST "whether any other individual has complained" about sexual harassment at the company. Although many women had reported harassment by trainers or codrivers during long haul trips, CRST furnished to the Commission only two names. The EEOC eventually discovered that several hundred women employees claimed severe

---

[30]See *supra* n.16 regarding our ultimate affirmance of the district court's grant of summary judgment to CRST as to Payne's and Timmons's claims.

sexual harassment by CRST male trainers or driving partners during extended over the road trips. Their allegations against the truck drivers included claims of sexual propositioning, sexual assault, and rape. As the EEOC's investigation continued, it learned that CRST had originally taken minimal action in response to the women's reports of harassment.

During the course of the Title VII prelitigation process, the EEOC put CRST on notice that it was investigating a class of women employees and requested the company's help in identifying class members. See 29 C.F.R. § 1601.15 (explaining EEOC's investigative authority). The Commission informed CRST that it had found "reasonable cause to believe that [the company had] subjected a class of employees and prospective employees to sexual harassment." See 42 U.S.C. § 2000e-5(b) (directing Commission to issue reasonable cause determination after investigation). Subsequently the EEOC gave CRST an opportunity to achieve voluntary compliance despite the company's late response to the Commission's invitation to conciliate. See id. (stating that the Commission "shall endeavor to eliminate any . . . alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion"). During the conciliation process the EEOC informed CRST that it did not have access to the number of class members or their names and needed the company's help to identify these individuals. CRST rejected this proposal, responding that the damage amount sought by Monika Starke made it "confident that conciliation will not result in a resolution of this matter." Thus unable to obtain cooperation from CRST, the EEOC proceeded with this lawsuit.

Neither Title VII nor our prior cases require that the EEOC conduct its presuit obligations for each complainant individually when litigating a class claim. Rather, we have required that the EEOC perform these duties for each *type* of Title VII violation alleged by the complainant. EEOC v. Delight Wholesale Co., 973 F.2d 664, 668–69 (8th Cir. 1992). Other circuit courts have similarly held that the "nature and extent" of the EEOC's investigation is beyond the scope of judicial review and that

the EEOC need not separately conciliate individual class members when pursuing a class based sexual discrimination claim.  EEOC v. Keco Indus., Inc., 748 F.2d 1097, 1100–01 (6th Cir. 1984); see also EEOC v. Rhone-Poulenc, Inc., 876 F.2d 16, 17 (3d Cir. 1989) (noting in ADEA case that EEOC need not conciliate individual class members); Dinkins v. Charoen Pokphand USA, Inc., 133 F. Supp. 2d 1237, 1245–46 (M.D. Ala. 2001) (noting that "[w]hat matters is that EEOC served [the employer] notice that it was investigating possible discrimination against a class of women" and that the EEOC need not "conciliate each individual's Title VII claim separately").

The cases relied on by the majority are not to the contrary. They require only that the EEOC give the employer notice during the administrative process of the nature and scope of the claim, not of the names of each potential class member.  For example, in EEOC v. Jillian's of Indianapolis, Inc., the court allowed the EEOC to proceed on behalf of a local class even though it had not named each individual in the reasonable cause determination or conciliated individual class members because the employer had notice that the EEOC was investigating a local class.  279 F. Supp. 2d 974, 983 (S.D. Ind. 2003).  It dismissed the nationwide class claims however because the employer had not had notice that the EEOC's investigation was national in scope.  Id.  Similarly, the court in EEOC v. Dillard's Inc. stated that the EEOC "is not required to identify every potential class member" before filing suit but permitted the EEOC to litigate only local class members' claims because the "scope of its pre-litigation efforts [was] limited" to one store location.  No. 08-1780, 2011 WL 2784516, at *6–8 (S.D. Cal. 2011).

The majority's new requirement that the EEOC separately investigate and conciliate each alleged *victim* of discrimination is inconsistent with the purpose of Title VII.  Under this standard employers can avoid disclosure to the EEOC of complaining workers while the Commission is conducting its investigation and conciliation, then reveal the names during court ordered discovery, and seek dismissal of the entire case on the ground of inadequate presuit efforts by the EEOC.  This

-56-

punishes the EEOC for employer recalcitrance and weakens its ability to enforce Title VII effectively. It also frustrates the underlying goal of the 1972 amendments intended to strengthen the EEOC's enforcement powers. See Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 325 (1980). The undesirable effects of a rule requiring the EEOC to investigate and conciliate each victim are illustrated in this case. The dismissal of scores of women claimants with apparent trial worthy claims is affirmed by the majority even though it was CRST which ended the conciliation process and even though the EEOC made substantial efforts to investigate and conciliate prior to filing its lawsuit.

While the majority justifies the dismissal by citing Title VII's emphasis on administrative resolution of disputes, here the EEOC made genuine efforts to resolve the dispute administratively and it was CRST that thwarted administrative resolution by providing the EEOC with incomplete information and rejecting its conciliation proposal. Given the EEOC's substantial presuit efforts, the district court's dismissal of trial worthy claims on the ground that the EEOC failed to complete its statutory duties should be reversed. At most, the case might have been stayed for further conciliation. Cf. EEOC v. Klingler Elec. Corp., 636 F.2d 104, 107 (5th Cir. 1981) (finding summary judgment "far too harsh a sanction to impose on the EEOC even if the court should ultimately find that conciliation efforts were prematurely aborted").

Finally, I respectfully disagree with the conclusion that the company's long haul trainers are not supervisors of the women trainees. In Faragher v. City of Boca Raton, the Supreme Court assumed that two employees were supervisors where they had been "granted virtually unchecked authority over their subordinates, directly controlling and supervising all aspects of [the alleged victim's] day-to-day activities." 524 U.S. 775, 808 (1998) (internal quotations and punctuation omitted). It observed that the alleged victim had been "completely isolated" from her employer's higher management. Id. (citation omitted). Like the supervisors in Faragher, the CRST long

haul trainers controlled almost all of a trainee's day to day activities, including when she was permitted to drive, when she could stop to use the bathroom, and when she could use the truck's satellite device to communicate with the outside world. The trainees were often confined in a truck for 28 consecutive days with their trainer who had authority to evaluate their progress and whose pass/fail rating was relied on by CRST in determining whether trainees would be promoted to full driver status. This unique environment facilitated the ability of certain trainers to make sexual propositions and demand sexual favors.

The tangible employment action cases cited by the majority involve situations where the harassers exercised less control over employment decisions than the trainers did in this case. See Cheshewalla v. Rand & Son Const. Co., 415 F.3d 847, 851 (8th Cir. 2005) (harasser "may have consulted" with management on tangible employment action); Weyers v. Lear Operations Corp., 359 F.3d 1049, 1057 (8th Cir. 2004) (termination decision based "in part" on alleged harasser's performance evaluation). Here, the lead drivers' pass/fail evaluations were relied on almost exclusively in deciding whether to promote a particular trainee. The fact that their promotion recommendations were nearly always followed weighs in favor of characterizing them as supervisors. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 747 (1998) (assuming harasser was supervisor although his hiring and promotion decisions were "subject to the approval of his supervisor, who signed the paperwork"). The record reveals that even CRST's human resources director characterized the trainers as "really no different than . . . supervisors."

The district court's analysis overlooked the practical reality created by the relationship between the trainer and the trainee in living and working together in the confined space of a truck over long routes and by the unusual level of control the trainers exercised over every aspect of the trainees' existence while on the road. The isolated work environment, trainees' extended time alone with the trainer, the lack of oversight from company management, the trainers' near total control over trainees'

daily lives, and the trainers' substantial control over trainees' promotion chances are sufficient to categorize the trainers as supervisors. The cases cited by the majority on this subject dealt with quite different factual circumstances not relevant to the unique factors present here. I would reverse the district court's ruling that none of the trainers were supervisors and the resulting dismissal of certain trainees' claims and remand those claims for consideration of whether CRST made out an Ellerth-Faragher affirmative defense.

I concur in the other parts of the majority decision, including the remand of the claims of Starke and Jones and the reversal of the unprecedented $4.5 million attorney fee award against the EEOC in favor of CRST. On remand any fee award against the EEOC should be closely considered since one should be made only in "very narrow circumstances." E.g. Marquart v. Lodge 837, 26 F.3d 842, 848 (8th Cir. 1994); see also Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422 (1978); EEOC v. Trans States Airlines, Inc., 462 F.3d 987, 996 (8th Cir. 2006) (affirming denial of attorney fee award against EEOC despite employer contention that it failed to conciliate).

In sum, the dismissal based on the conclusion that the EEOC failed to fulfill its presuit duties should be reversed, as should the conclusion that none of CRST's trainers were supervisors. While this is admittedly a complex case, the court should still give effect to Title VII and ensure that the EEOC can fulfill its congressional mandate.

_____